In re PAPERCRAFT CORPORATION, a Pennsylvania Corporation, Debtor.

COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS and Committee of Creditors Holding Unsecured Claims, as Estate Representative of Papercraft Corporation, Plaintiffs,

v.

CITICORP VENTURE CAPITAL, LTD., a New York Corporation, Defendant.

Bankruptcy No. 91–00903 JKF.
Adv. No. 91–0642.

United States Bankruptcy Court, W.D. Pennsylvania.

Oct. 12, 1995.

Philip E. Beard, Pittsburgh, Stephan M. Ray, Los Angeles, CA, for plaintiffs.

Paul K. Vey, Pittsburgh, PA, for defendant.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

The matter before the court is an action by the Committee of Creditors Holding Unsecured Claims and Committee of Creditors Holding Unsecured Claims as Estate Representative of Papercraft Corporation (hereafter collectively "creditors' committee" or "committee") for equitable subordination and objecting to the claim of Citicorp Venture Capital, Ltd. (hereafter "CVC"). Previously this court addressed the allowance of the claim on a motion for partial summary judgment. By opinion and order dated April 22, 1994, we granted partial summary judgment to the committee. We allowed CVC's claim as a general unsecured claim in the amount of $60,849,299.10, the face value of the notes it purchased, but limited CVC's recovery to $10,553,541.88, the amount CVC paid for its claim. On November 14 and 15, 1994, trial was held to determine whether CVC's claim should be equitably subordinated. At the conclusion of trial the parties requested that we decide all issues raised in the adversary complaint based on the evidence and testimony adduced at trial.

 In accordance with that request, we have considered the evidence, testimony, arguments, pleadings and briefs and vacate our order of April 22, 1994, granting partial summary judgment. Accordingly, we withdraw the opinion that accompanied the April 22, 1994, order. We now conclude that it is appropriate to apply a per se rule prohibiting insiders of a debtor from purchasing claims against it without disclosing their identity and connection with the debtor. We further hold that, when claims are purchased by insiders without the requisite disclosure to the debtor and creditors, the allowed amount of the insider's newly acquired claim will be limited to the amount paid by the acquiring insider and recovery on the claim will be limited to the percentage distribution provided in the plan, as applied to the allowed claim.

The following facts were established by stipulation of the parties or from the evidentiary record:

1. In 1985, Debtor completed a leveraged buyout (LBO) with the assistance of an affiliate of CVC.

2. The LBO transformed Debtor from a publicly traded company into a wholly-owned subsidiary of Amalgamated Investment Corporation (hereafter "Amalgamated").

3. CVC acquired a 28% equity position in Amalgamated as a result of the LBO. It wrote off the equity position in 1987 because it expected no return on its investment.

4. At all relevant times, a representative of CVC sat on the boards of directors of Amalgamated, Debtor, Barth & Dreyfuss and Knomark, subsidiaries of Debtor. After 1989, that representative was CVC's Vice President, M. Saleem Muqaddam, who served on the boards of those companies.

5. Barth & Dreyfuss and Knomark were subsidiaries of Debtor at all relevant times.

6. In April of 1989, Debtor completed a restructuring of its debt which resulted in an exchange of approximately 98% of Debtor's debentures for unsecured First Priority and Second Priority notes.

7. The First Priority Notes were issued under an Indenture dated May 15, 1989, and were to mature on October 1, 1994. An aggregate amount of $90,717,398 (principal plus accrued interest) was outstanding on the date Debtor's chapter 11 case was filed.

8. The Second Priority Notes were issued under a separate Indenture, also dated May 15, 1989, and were to mature on April 1, 1995. An aggregate amount of $56,318,767 (principal plus accrued interest) was outstanding on the date the chapter 11 case was filed.

9. Debtor was unable to meet the terms of the notes. Therefore, in the fall of 1990, Debtor sought another restructuring of its unsecured debt and began pre-bankruptcy negotiations with creditors who were part of what has been termed in this case the "Informal Committee".

10. After several months of prepetition negotiations, Debtor and the Informal Com-

mittee reached an agreement on what is called herein the BDK Plan of Reorganization which was to be filed in conjunction with a chapter 11 case.

11. The BDK Plan would effect a reorganized enterprise and was unanimously approved by Debtor's board, including CVC through Muqaddam, in March of 1991.

12. Debtor filed a voluntary chapter 11 petition on March 22, 1991.

13. At that time, CVC held none of Debtor's First or Second Priority Notes and was not a creditor of Debtor.

14. Debtor was insolvent on the filing date and all relevant times thereafter.

15. On March 25, 1991, three days after this bankruptcy began, Debtor filed the BDK Plan, without a disclosure statement. A disclosure statement was not filed until October 15, 1991.

16. In March of 1991, Muqaddam sought the approval of CVC's Investment Committee for CVC to purchase Papercraft notes.

17. On April 1, 1991, CVC's Investment Committee granted approval for CVC to purchase up to $10 million of Papercraft notes.

18. In early May, 1991, Muqaddam prepared a review of CVC's investment in Amalgamated.

19. CVC purchased $60,849,575.72 face value of the Papercraft notes for $10,553,-541.88 between April and August of 1991. Approximately $7.4 million (more than 70%) of CVC's purchases of Papercraft notes were made on or after August, 19, 1991.

20. CVC acquired 38.3% of Debtor's First Priority Notes, 46.4% of Debtor's Second Priority Notes, and 40.8% of Debtor's total unsecured claims.

21. CVC neither requested nor obtained the approval of Debtor's board, the creditors' committee, or the court to buy the notes.[1]

22. Debtor learned of CVC's initial purchases of notes by May, 1991, that is, after CVC made the purchases. Its counsel became aware that CVC had purchased some claims by June of that year. Debtor and its counsel also learned of CVC's later purchases.

23. In April of 1991, the committee heard a rumor that CVC was purchasing claims. The committee heard no more about it until CVC made its asset purchase offer in September of 1991. Neither CVC nor Debtor communicated to the committee the status or extent of CVC's purchases.

24. CVC acquired the RTC's First Priority and Second Priority Notes for 25¢ and 12¢ on the dollar, respectively. Magten unsuccessfully bid for the notes at 20.5¢ and 10.5¢. When CVC bought the RTC's notes, Muqaddam estimated that the RTC controlled approximately 20% of Debtor's total unsecured claims.

25. At the values established by this court at the BDK plan confirmation hearing, noteholders received an interest in BDK Units equal to 33.5¢ on the dollar for First Priority Note claims and 16.75¢ on the dollar for Second Priority Note claims.

26. At Muqaddam's direction, and with the knowledge and consent of Debtor's management, two employees of CVC, Noelle Cournoyer and Nils Havgestad, visited Barth & Dreyfuss in January or February of 1991. The purpose of the visit was to obtain information about the company in the event that CVC decided to make an asset purchase proposal. During their 1½ day visit, CVC's representatives obtained current Barth & Dreyfuss financial statements, looked at the company's product

---

1. On or about May 23, 1991, while it was a member of the creditors' committee, Magten purchased, on behalf of clients, approximately $3.8 million in Second Priority Notes from Oppenheimer & Co. for approximately $379,000. Oppenheimer was a member of the Informal Committee and acknowledged in writing that it knew Magten was the purchaser. Magten also made other offers to purchase Papercraft notes, again on behalf of clients. In January, 1991, Magten entered into a settlement agreement by which it agreed to receive no more than its cost of these claims at the time of distribution under the plan. Magten disclosed to those entities from which it purchased notes its position with the committee and the bankruptcy. Unlike CVC, Magten had disclosed its identity and connection with Debtor. Furthermore, Magten was not buying notes for its own account, as was CVC, but for accounts of its customers.

lines, discussed the company with its management, and toured the plant.

27. Cournoyer prepared a written report on Barth & Dreyfuss, drafts of which were provided to Debtor, but not to the committee.

28. Frank Kane, the Chief Financial Officer of Debtor, reviewed drafts of the Barth & Dreyfuss report and gave his comments to Muqaddam. Kane did not discuss the report with or provide it to the committee.

29. Kane, Muqaddam, and a representative of the Bank of New York Credit Corporation (BNYCC), a Barth & Dreyfuss lender, held a meeting on June 14, 1991. At that meeting, Muqaddam made a presentation to BNYCC for financing a possible purchase of Barth & Dreyfuss and Knomark by CVC.

30. At some point during or after the meeting, Muqaddam gave BNYCC a copy of the Barth & Dreyfuss report and a one page summary of a possible structure for an asset purchase transaction.

31. Muqaddam received a financing term sheet from BNYCC dated August 12, 1991. He provided a copy of the term sheet to Kane and obtained Kane's comments on the term sheet. CVC agreed to the terms.

32. After the filing of the bankruptcy, Debtor, through Kane and Andre Francois, Debtor's manager of corporate accounting, reviewed documents prepared by CVC and prepared documents for Muqaddam and Cournoyer with respect to the proposed asset purchase.

33. Chanin and Company was the financial advisor to the committee. On July 18, 1991, Debtor's Chief Executive Officer, Michael Arnold, faxed Chanin and Company's enterprise valuation to Muqaddam. Arnold received the valuation on July 16, 1991.[2]

34. Kane faxed Chanin and Company's distressed sale analysis to Muqaddam on August 6, 1991.

35. At Muqaddam's request, Debtor engaged Arthur Andersen & Co. to analyze whether CVC's note purchases would have any adverse tax effect on Debtor.

36. Debtor received a written tax analysis from Arthur Andersen & Co. dated August 26, 1991. Kane faxed a copy of the tax analysis to Muqaddam.

37. Muqaddam prepared a memo to CVC's Investment Committee dated August 23, 1991, requesting authority to make an offer to purchase the valuable operating subsidiaries of Debtor, i.e., Barth & Dreyfuss and Knomark.

38. Thereafter, in August of 1991, CVC's Investment Committee granted Muqaddam authority to cause CVC to make an asset purchase offer.

39. On August 26, 1991, Muqaddam sought and obtained the approval of CVC's Investment Committee to increase note buying authority from $10 million to $15 million.

40. In the week before CVC made its asset purchase offer, that is, before September 13, 1991, Muqaddam called Pamela Cascioli, chairperson of the creditors' committee, and informed her that CVC was contemplating making an offer to purchase Debtor's assets. He also indicated that CVC had purchased Papercraft notes, including those held by the RTC. This was the first time that CVC informed the creditors' committee that it intended to make an asset purchase offer. It also was CVC's first communication or confirmation to the committee of the fact that CVC had purchased notes.[3]

41. Shortly before September 13, 1991, Muqaddam provided drafts of an asset purchase agreement to Debtor for its review and comment.

---

2. The parties stipulated to July 16, 1994, but the 1994 date may be a typographical error. The date that Arnold received the information is not material, however. The pertinent fact is that Muqaddam received Chanin and Company's enterprise valuation from Arnold.

3. In his pretrial declaration, Muqaddam states that "CVC made formal disclosure to entities that were members of the Creditors' Committee much earlier" than September of 1991. Defendant's Pre–Trial Evidentiary Submission, Declaration of M. Saleem Muqaddam, Docket Entry 122. However, we do not credit his statement. The weight of other testimony and all of the credible evidence establishes that this did not occur.

42. CVC made its asset purchase offer in a letter to Debtor dated September 13, 1991. BNYCC had agreed to provide financing.

43. On October 15, 1991, Debtor filed an amended version of the BDK Plan which was further amended on subsequent occasions.

44. Debtor also filed a second plan, the CVC Plan, at CVC's suggestion, on October 15, 1991. CVC's asset purchase offer formed the cornerstone of the CVC Plan. CVC consented to the use of its asset purchase offer in the CVC Plan.

45. Debtor filed a disclosure statement for the Amended BDK Plan on October 15, 1991, and a disclosure statement for the CVC Plan on the same date.

46. The court approved the BDK disclosure statement on December 17, 1991.

47. CVC filed objections to confirmation of the Amended BDK Plan on January 14, 1992, because the creditors' committee did not agree to CVC's claim based on the face amount of the notes. The plan was confirmed on January 21, 1992.

48. Debtor retained the exclusive right to file a plan from the date of the filing of the bankruptcy through the plan confirmation.

49. When purchasing claims, CVC did so through brokers which resulted in CVC's identity not being revealed.[4]

For the reasons which follow, we find that CVC's nondisclosure of its claims purchases was inappropriate and we adopt a per se rule against "insider trading" in bankruptcy cases absent pre-purchase disclosure of the insider's identity, connection to the debtor, and nature of the activity. CVC is an insider by definition under the Bankruptcy Code. 11 U.S.C. § 101(31)(B). In our prior opinion we analyzed in detail CVC's insider status by virtue of its relationship with Muqaddam and

Amalgamated. *See In re Papercraft Corporation,* 165 B.R. 980, 987 & n. 12 (Bankr. W.D.Pa.1994). We repeat that analysis here.

The Bankruptcy Code defines an insider of a corporate debtor as *including*

> directors, officers of the debtor, persons in control of the debtor and other entities not relevant to the issue herein.[5]

11 U.S.C. § 101(31)(B). Although there are numerous bankruptcy court decisions regarding who an insider might be, few courts of appeals have passed on the question. Those which have addressed the issue agree that use of the word "includes" in defining "insider" suggests an expansive interpretation of the term rather than a limited one. *See Matter of Holloway,* 955 F.2d 1008 (5th Cir. 1992) (rehearing denied); *Matter of Newcomb,* 744 F.2d 621, 625 n. 4 (8th Cir.1984); *Matter of Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 210 (5th Cir. 1983). The unrestricted view of the definition of insider is based on legislative history. *In re Missionary Baptist Foundation of America, Inc.,* 712 F.2d at 210. That history teaches that an insider "is an entity or person with a 'sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.'" *Id.,* citing S.Rep. No. 95–989, 95th Cong., 2d Sess. U.S.Code Cong. & Admin.News p. 5787. *See also Matter of Holloway,* 955 F.2d at 1010; *Matter of Newcomb,* 744 F.2d at 625, n. 4. What constitutes a "sufficiently close relationship with the debtor" is a question of fact. *Cf., Matter of Holloway,* 955 F.2d at 1014 ("the determination of insider status is a question of fact").

▬ We find that the facts establish that CVC had a "sufficiently close relationship" with Debtor to constitute CVC a statutory insider.[6] Through its equity position in

---

4. CVC switched brokers, from Citicorp Securities Markets, Inc., to UBS Securities, when Citicorp Securities had been unsuccessful in obtaining the notes held by the RTC for CVC.

5. "Person" is defined as including corporations. 11 U.S.C. § 101(41). However, CVC is not "in control of" Debtor insofar as it lacks voting stock. To the extent that it had its representative (Muqaddam) on Debtor's board CVC had influ-

ence but alone could not control Debtor's day-to-day functioning.

6. Cases finding insider status of those not specifically identified in § 101 include *In re Holloway,* 955 F.2d 1008 (5th Cir.1992) (divorced spouses); *In re Tanner,* 145 B.R. 672 (Bankr.W.D.Wash. 1992) (lovers); *In re Standard Stores, Inc.,* 124 B.R. 318 (Bankr.C.D.Cal.1991) (corporate debtor's president's ex-brother-in-law); *In re O'Connell,* 119 B.R. 311 (Bankr.M.D.Fla.1990) (friend

Amalgamated, Debtor's affiliate, 11 U.S.C. § 101(2), CVC controlled, prepetition, at least one seat on the boards of directors of Amalgamated, Debtor, and Debtor's principal subsidiaries. These seats were occupied by CVC's vice president, Muqaddam. Deposition of M. Saleem Muqaddam at 17–18, 21 (hereafter "Muqaddam Deposition"). Through Muqaddam's position on Debtor's board, CVC had access to financial information with respect to Debtor and its reorganization plans. Furthermore, CVC took part in various business decisions concerning Debtor, and was in a strategic position regarding Debtor's restructuring and reorganization. Muqaddam was on Debtor's board because Pennsylvania law requires that corporate directors be natural persons. 15 Pa. Cons.Stat.Ann. § 1722. Thus, CVC itself could not serve as a director of Debtor and, instead, placed on Debtor's board[7] Muqaddam as its representative. Muqaddam testified that his duties as an employee of CVC include investing on CVC's behalf. Muqaddam Deposition at 6. He acknowledged in his deposition that he served on Debtor's board on behalf of CVC and that he acted as a director of Debtor with CVC's best interests in mind. As a vice president of CVC, Muqaddam was responsible for acquiring and

monitoring CVC's investment in Debtor and related entities. Muqaddam Deposition at 11–13, 153.

Muqaddam, while on Debtor's board, approached CVC with the proposition that CVC purchase claims against Debtor. CVC then authorized the purchases and provided the funds. Financial projections for two of Debtor's subsidiaries, Barth & Dreyfuss and Knomark, were prepared to assist the committee by the committee's financial advisor, Chanin and Company. The committee shared that information with Debtor. Without the committee's knowledge or consent, it was then given to Muqaddam by Debtor's senior management to assist CVC in constructing an asset purchase offer. Debtor assisted in modifying the projections at Muqaddam's request because he was a director of Debtor. The modifications were made with information obtained by CVC through a site visit to the subsidiaries by Cournoyer and Havgestad. These modified projections, although part of Debtor's records, were never provided to the committee, its counsel, or its financial advisor. Muqaddam evaluated the subsidiaries and knew that the price range at which their acquisition would be made would be below the potential economic values of the companies. He expected CVC to make a

---

who made several informal loans to the debtor); *In re Ribcke*, 64 B.R. 663 (Bankr.D.Md.1986) (parents of debtor's deceased wife); *Matter of Montanino*, 15 B.R. 307 (Bankr.D.N.J.1981) (parents of debtor's live-in fiance).

Financial power over the debtor may be insufficient in and of itself to make an entity an insider. *In re Torcise*, 146 B.R. 303 (Bankr. S.D.Fla.1992), held that, in order for a bank or its officers to be insiders in a preference action, they must have "unreasonable control" over the debtor or the debtor must have become the bank's alter ego or instrument. *Cf. In re Polk*, 125 B.R. 293 (Bankr.D.Colo.1991) (the degree of control). While this court will not go so far as to find that control, reasonable or otherwise, is the only test of insider status, we agree that control is one of many factors to consider in determining insider status. In this case CVC had Muqaddam, its officer and one of Debtor's directors, as its instrumentality. Muqaddam acted for CVC's benefit and on its behalf. Through Muqaddam CVC achieved its insider status. Through Muqaddam CVC was a de facto director and therefore was in a position to exercise some control.

7. As a matter of law, Muqaddam was CVC's agent and, under the doctrine of respondeat superior, CVC is liable for Muqaddam's breach of

fiduciary duty. *See* § V, Fiduciary Duty, *infra*. CVC "knowingly permit[ted] its agent", Muqaddam, to purchase claims against Debtor, authorized his actions and provided him with the authority and the means to accomplish the purchase. *Moss v. Elan Memorial Park Corp.*, 400 Pa.Super. 555, 583 A.2d 1254, 1257 (1990). CVC expressly granted to Muqaddam the power and funds with which to purchase the claims and so is bound by Muqaddam's actions. *See Lokay v. Lehigh Valley Co-op. Farmers, Inc.*, 342 Pa.Super. 89, 492 A.2d 405, 409 (1985). Muqaddam was acting within the scope of his employment with CVC in purchasing the claims and his conduct was in furtherance of CVC's business inasmuch as he was charged with the responsibility of monitoring CVC's investments and ensuring their aggrandizement. Pennsylvania law dictates that under these circumstances CVC is liable for Muqaddam's conduct. *See Johnson v. Glenn Sand and Gravel*, 308 Pa.Super. 22, 453 A.2d 1048, 1050 (1982) (tort liability). In fact, CVC's liability would exist even if Muqaddam was only partially motivated by a desire to serve CVC's interests. *Shuman Estate v. Weber*, 276 Pa.Super. 209, 419 A.2d 169, 173 (1980).

profit based on the valuation of the notes CVC intended to purchase. Muqaddam Deposition at 93, 218–19.

■ Frank T. Kane, Debtor's former chief financial officer, testified that financial projections prepared by or for Debtor in connection with the bankruptcy were modified at the request of Muqaddam or a member of his staff with reference toward CVC's proposed asset purchase. Deposition of Frank T. Kane, April 10, 1992, at 80–81 (hereafter "Kane Deposition"). Although the projections were a part of Debtor's records, they were never provided to Chanin & Company, any member of the creditors' committee, or to its counsel. Kane Deposition at 81.[8] Thus, even if, as CVC argues, all Debtor's records were in the public domain by virtue of the bankruptcy, the records constitute inside information when their existence is not disclosed except to insiders.

■ It is the *access* to the inside information that renders trading in claims particularly dangerous in a bankruptcy situation. *Wolf v. Weinstein*, 372 U.S. at 642, 83 S.Ct. at 975–76. CVC had virtually unrestricted access to inside information and significant assistance from Debtor through its employees and staff and its control over its subsidiaries. Muqaddam admitted at trial that prepetition he had been approached to buy Papercraft notes but refused because he had inside information at that time. In his view, postpetition, all financial information was on the public record and, therefore, he considered himself not to be an insider. Contrary to his assertion, the evidence established that all of the information was not of record at the time he received it. Moreover, the committee did not know that Debtor prepared information for and gave it to Muqaddam, at his request, because he was a director of Debtor and which, in turn, Muqaddam used to further CVC's corporate interests.

■ Even if all of the information had been on the public record, that fact would not have changed CVC's insider status. Moreover, nothing in the Bankruptcy Code indicates that an entity's insider status is abrogated because some or all of Debtor's financial information becomes public. Insider status is a function of an entity's relationship to the debtor and/or to other insiders. *See, e.g.,* 11 U.S.C. § 101(31)(B) (" 'insider' includes ... (B) if the debtor is a corporation—(i) director of the debtor ... or (vi) relative of a ... director, officer or person in control of the debtor"). Insider status is not a function of what, if any, financial information Debtor publicizes. Although the committee had access to Debtor's records, it was not in a position similar to CVC's with respect to information about Debtor. CVC, as a member of Debtor's board, engaged in various business decisions affecting Debtor and was in a strategic and unique position regarding Debtor's restructuring and reorganization.

In this case, CVC, through Muqaddam, had an advantage available only to insiders. When requests for information were made of Debtor by parties in interest in this case the testimony was undisputed that Muqaddam's requests always received priority treatment because of his position.

■ In deposition, William T. Comfort, chairman of the board of directors of CVC and a member of the investment committee that approved CVC's note purchases, testified that CVC invested in the Papercraft notes to preserve CVC's reputation. He explained that if an entity in CVC's position is seen to abandon one of its flock in distress, the company loses some of its credibility in the marketplace. He further testified that a secondary consideration was a return on

---

8. Although projections were provided to the creditors' committee, they apparently were not the same as those contained in the modifications provided to CVC. Kane Deposition at 80–88. CVC also requested, and was provided, projections of monthly working capital and income distribution but Kane was not sure if the numbers used were those based on CVC's assumptions or if the information was based on Debtor's projections. *Id.* at 85. However, Kane also tes-

tified that Muqaddam "or one of his representatives" had asked for "a monthly model for an income statement, balance sheet and cash flow to disclose to [CVC] the working capital changes and income statement movement within a prescribed period of time," *id.* at 87, with respect to Barth and Dreyfuss in order to determine that company's seasonal credit requirements. *Id.* at 88.

CVC's investment. Deposition of William Comfort at 31, 36 (hereafter "Comfort Deposition"). His testimony does not fit squarely with that of Michael Arnold, who was Debtor's president and the CEO of Debtor, its subsidiaries and Amalgamated and held a seat on Amalgamated's board of directors. Mr. Arnold stated that in January or February of 1991, he first became aware that CVC was analyzing Barth & Dreyfuss to determine whether a purchase offer would be a possibility. Deposition of Michael Arnold at 63–64 (hereafter "Arnold Deposition"). By letter dated October 4, 1991, from Muqaddam addressed to him, Arnold learned that CVC held claims and was informed that CVC would vote to reject a plan that did not pay it in full. *Id.* at 139. We credit Mr. Arnold whose statement somewhat belies Comfort's assertion that CVC's conduct was only *secondarily* motivated by its desire for profit. What is consistent in both witnesses' testimony is that CVC intended to enhance CVC's goals, by protecting its reputation and/or by adding to its profits, even if that goal conflicted with Debtor's negotiated reorganization.

CVC's defense is further undermined by inconsistencies in Muqaddam's trial, deposition, and declaration testimony. For instance, in its pretrial evidentiary submission, CVC presented a declaration by Muqaddam in which he stated that he believed that he had not requested Chanin and Company's enterprise valuation and its distressed sale analysis. At trial Muqaddam stated that he had asked for the information to illustrate the fairness of CVC's asset purchase offer. In his deposition given in connection with the committee's motion for partial summary judgment, Muqaddam stated that he had not sought the advice of counsel concerning the purchase of Papercraft notes. Muqaddam Deposition at 90. At trial Muqaddam stated that had he consulted with a law firm concerning whether CVC could make the purchase and the propriety of the purchase, but his inquiry was only an informal request concerning regulatory matters.

At trial Muqaddam denied that CVC's particular goal was to purchase the Papercraft notes held by the RTC. In his deposition given in connection with the motion for partial summary judgment, however, he testified that one goal was to buy the RTC notes because he feared another entity, such as Second Pennsylvania, would do so, thereby disrupting, or attaining a position from which to disrupt, the reorganization process. In addition to these inconsistencies in testimony, the court took particular note of Muqaddam's demeanor at trial. On the witness stand, Muqaddam perspired heavily in an air conditioned room and drank huge quantities of water. He is a sophisticated businessman accustomed to pressure but he exhibited extraordinary nervousness given the circumstances. We find from the evidence as a whole that CVC's intention was to benefit from its position as a director of Debtor by purchasing claims at a discount.

 CVC tries to excuse its failure to disclose its identity and insider position based on evidence that, in April of 1991, the committee had knowledge of a *rumor* that CVC had purchased some notes. The fact and/or extent of the committee's knowledge is not controlling. CVC, as an insider of Debtor, had an obligation to formally disclose its identity and status as an insider to the sellers, Debtor, and the committee prior to purchasing claims during the bankruptcy. CVC did not disclose its identity to Debtor or the committee before it purchased the notes and never disclosed its identity or its seat on Debtor's board of directors to the sellers. The purchases gave CVC voting control over Class 4, an impaired class of general unsecured creditors under the BDK plan. CVC held no claims against Debtor prepetition but during the period between April 1, 1991, and August 30, 1991, obtained 40 percent of all outstanding notes, thereby gaining the ability to control the voting in its class on a reorganization plan.

CVC never cast a vote for or against the plan. As it was, although it had voted in favor of the BDK plan concept prepetition, CVC filed objections to the BDK plan which were not withdrawn until it was promised a seat on the board of the reorganized debtor and certain distribution language was changed in the plan. Without the withdrawal of CVC's objections (or some form of disen-

franchisement of its voting rights), it was questionable whether the BDK plan could be confirmed as fair and equitable because of the 40 percent interest CVC acquired during the case. As a further result of the purchases, CVC was in a position to gain a profit under the confirmed plan of approximately $5.4 million if its claims were allowed in amounts equal to the face value of the notes.

Because of CVC's postpetition interest acquired in Debtor, a second plan of reorganization, the CVC plan, was filed. The BDK plan had provided for formation of a new company by merger of some of the subsidiaries, a stock for debt exchange, and certain cash payments. The CVC plan essentially was a cash offer by CVC to buy certain assets and operating subsidiaries of Debtor without acquiring certain associated liabilities. CVC's undisclosed claims purchases facilitated this turn of events. Its conduct created litigation that would not have been needed otherwise and was an impropriety, if not actual wrongdoing, that cannot be countenanced.

 CVC's conduct falls within the "vulture investor" category. *See Vultures Beware: Risks of Purchasing Claims Against a Chapter 11 Debtor*, 48 Bus.Law. 915, 924 (May 1993) (hereafter *"Vultures Beware"*).

The typical *modus operandi* of a vulture investor is to purchase trade claims, bank debt, or other securities at a discount from the face amount, and often to purchase sufficient voting power to enable the vulture investor to block confirmation of any plan of reorganization proposed for the debtor that the vulture investor does not like.

*Id.* at 916 (footnote omitted).

Vulture investors may control the terms for the reorganization of a debtor in chapter 11 by means of the purchase at bargain prices of a blocking vote position in a significant debt class. This could enable a vulture investor to dictate the terms of the reorganization, which could result in very large rewards for the investor. The reason that vulture investors are able to reap

such large returns is that some chapter 11 debtors end up in chapter 11 not so much because their businesses have gone bad, but because of the leveraged debt that they could not shoulder ... The result can [have] ... the vulture ending up with the dominant ownership position in a good business, after having paid a bargain price for a debt position which merely served as a means to acquire the debtor's business through the vehicle of chapter 11.

*Id.* at 917 (footnote omitted). This is precisely the conduct in which CVC engaged and which cannot be tolerated in fiduciaries in a bankruptcy case. CVC's status as an insider, whether or not it used inside information, precluded the sellers from making a fully informed assessment of the consequences of selling their claims and thereby deprived them of the opportunity to make an informed decision regarding the sale.

 A member of a board of directors holds a fiduciary duty "to promote the interests of the corporation." *United States v. Byrum*, 408 U.S. 125, 138, 92 S.Ct. 2382, 2391, 33 L.Ed.2d 238 *rehearing denied*, 409 U.S. 898, 93 S.Ct. 94, 34 L.Ed.2d 157 (1972). In this instance CVC used its position on Debtor's board to further its own interests— it sought to salvage or enhance its reputation and it sought a profit for itself. The credible evidence supports the conclusion that, while it served as a director of Debtor, CVC acted in furtherance of CVC's interests.

 Furthermore, corporate directors bear "the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession." *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985). *See also Wolf v. Weinstein*, 372 U.S. 633, 649, 83 S.Ct. 969, 979, 10 L.Ed.2d 33 *rehearing denied*, 373 U.S. 928, 83 S.Ct. 1522, 10 L.Ed.2d 427 (1963). Upon insolvency of the corporation, the director's fiduciary duty extends to the corporation's creditors and is enforceable by the trustee.[9] *See Pepper v. Litton*, 308 U.S. 295, 307, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *Brown v. Presbyterian Ministers*

---

9. Moreover, "a creditors' committee ... may raise and may appear and may be heard on any

issue in a case under" chapter 11. 11 U.S.C. § 1109(b).

*Fund,* 484 F.2d 998, 1005 (3d Cir.1973). In this case Muqaddam utilized his position on Debtor's board to advance CVC's interests. He did not carry out his fiduciary obligation to act in the best interests of Debtor and its estate.

▮ Although directors may purchase claims against their corporation when the corporation is solvent, they are not entitled to do so at a discount and enforce the claims at full value when the corporation is insolvent or has filed bankruptcy. *In re Bridgford Co.,* 237 F.2d 182, 185 (9th Cir.1956), *cert. denied Bridgford v. Sampsell,* 352 U.S. 1005, 77 S.Ct. 566, 1 L.Ed.2d 550 (1957). *See also Manufacturers Trust Co. v. Becker,* 338 U.S. 304, 313–14, 70 S.Ct. 127, 132–33, 94 L.Ed. 107 (1949); *Monroe v. Scofield,* 135 F.2d 725 (10th Cir.1943); *In re UVAS Farming Corp.,* 91 B.R. 575, 577 (Bankr.D.N.M.1988) (when a director purchases claims against its corporation in bankruptcy, recovery is limited to the amount paid for the claim). This is not a situation where a Chinese wall was implemented with policies and procedures effective to prevent the misuse of nonpublic information, *see In re Federated Dept. Stores, Inc.,* 1991 WL 79143 (Bankr.S.D.Ohio, March 7, 1991), nor was it an arm's length transaction and the bankruptcy court is not required to treat these claims equally with those of other creditors. *See Pepper v. Litton,* 308 U.S. 295, 306–07, 60 S.Ct. 238, 244–46, 84 L.Ed. 281 (1939).

▮ The availability of claims for purchase at a discount pursuant to a bankruptcy constitutes a corporate opportunity. *Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1004 (3d Cir.1973). Absent a bankruptcy case, a director may use the opportunity if the director discloses to shareholders, the shareholders consent, and the use of the corporate opportunity by the director is not detrimental to the corporation. *CST, Inc. v. Mark,* 360 Pa.Super. 303, 520 A.2d 469, 471 *appeal denied,* 517 Pa. 630, 539 A.2d 811 (1987). *See also Robinson v. Brier,* 412 Pa. 255, 194 A.2d 204, 206, 208 (1963). A di-

rector who purchases claims without first providing the debtor with the opportunity to make the purchases violates his fiduciary duty. *See, e.g., In re Cumberland Farms, Inc.,* 181 B.R. 678 (Bankr.D.Mass.1995).

▮ Even when purchasing claims against a solvent corporation, a director has a heavy burden to establish the fairness of the conduct. *Robinson v. Brier,* 194 A.2d at 206. Appropriation of corporate opportunities by a fiduciary of an insolvent entity, even with approval of the shareholders, directors, and officers, is impermissible when it results in a detriment to creditors. *Brown v. Presbyterian Ministers Fund,* 484 F.2d at 1005.

▮ Detriment is a relative term. In this case, at least three adverse effects are identifiable. The first befell the selling noteholders who, at the time of sale, were creditors of Debtor and were deprived of the ability to make a fully informed decision concerning the sale of their claims. If, after full disclosure, they had elected not to sell, they would have received a total distribution of $15,989,676.56 under the plan rather than the amount paid by CVC of $10,553,541.88, a difference of more than $5.4 million. Of course, they may have elected to sell after full disclosure, in which event the court would not be left to second guess their business choices. The harm lies in the fact that the selling noteholders had no opportunity to consider pertinent information.

The second is that CVC's actions diluted the voting rights of prepetition creditors[10] and resulted in CVC's attempt to wrest from the prepetition creditors the valuable assets of Debtor. Lack of disclosure

> has two effects. First, it is detrimental to the efficiency of the market for claims. An efficient market requires that both the buyer and the seller have access to information so that each party to the transaction can be adequately informed. Under Bankruptcy Rule 3001(e), as amended, large sophisticated purchasers of claims, who have the resources and incentives to

---

10. CVC did not vote its claims. Nonetheless, its acquisition of claims placed it in the controlling seat in its class and, but for the creditors' committee's actions to contest CVC's claims, we are again left to speculate as to whether CVC would have voted. CVC's non-vote does not nullify the need for a per se rule. Absent a per se rule, CVC would still profit from its purchases of claims monetarily and/or in its enhanced reputation and similar conduct would not be deterred.

closely monitor a chapter 11 case, have more information regarding the value of a claim than a small trade creditor, and the small trade creditor has no reasonable means to acquire that information. Second, because only the name of the transferee of record need be disclosed, parties in interest will be unable to ascertain who the real claims buyer is and the intentions of that claims buyer with respect to the control of a debtor.

Joy Flowers Conti, Raymond F. Kozlowski, Jr., Leonard S. Ferleger, *Claims Trafficking in Chapter 11—Has the Pendulum Swung Too Far?*, 9 BANKRUPTCY DEVELOPMENTS JOURNAL # 2, at 300 (1992) (hereafter *Claims Trafficking* ) (footnotes omitted).

The third is that, by purchasing, CVC put itself in a position of having a conflict of interest by jeopardizing its ability

to make future decisions on claims as a director free of [its] own personal interests as owner of claims. Adding to the conflict is the fact these purchases were made at a discount from present value. This brings into play a profit motive, accentuating [its] personal interests.

*In re Cumberland Farms, Inc.*, 181 B.R. at 680 (citations omitted).

■■■■ The filing of a bankruptcy creates a private market in securities and CVC's protestations that its failure to disclose constituted "normal market protocol" are unpersuasive. "[C]orporations in bankruptcy are treated differently from solvent corporations". *Commodity Futures Trading Comm'n. v. Weintraub,* 471 U.S. 343, 357, 105 S.Ct. 1986, 1995, 85 L.Ed.2d 372 (1985). The evidence established that Debtor was insolvent in an equity sense at confirmation. In that circumstance, "[t]he purchase by a director of claims against his own corporation ..., particularly the purchase of claims at a discount, places too much strain upon the loyalties of the director." *In re Cumberland Farms, Inc.*, 181 B.R. at 680. A director of a corporation in bankruptcy should have no conflicting interest in dealings on behalf of the corporation with those holding claims against it.

The evidence also established that CVC intended to gain influence over the case. Comfort Deposition at 143 (Comfort stated that the note purchases by CVC would put it in a position "to help influence something"). Without disclosure by insiders of their trading in claims, creditors are at risk of selling claims "at extraordinary discounts, without understanding their rights". *In re Allegheny Int'l., Inc.,* 100 B.R. 241, 242 (Bankr. W.D.Pa.1988) (footnote omitted).

■■■■ "Disclosure is fundamental in a bankruptcy case." *Claims Trafficking,* 9 BANKR.DEV.J. at 302. "The interest of sellers in having adequate information available for them to make an informed decision and the interest of nonsellers who may find themselves controlled by a third party whose intent would be to minimize the value that goes to the nonsellers are the two interests that need to be protected in control contests." *Id.* at 304. Several provisions of the Bankruptcy Code are grounded in the concept of disclosure. For example, a debtor must disclose all of its assets and liabilities. *See* 11 U.S.C. § 521 (debtor must file schedule of assets and liabilities); § 101(12) (" 'debt' means liability on a claim"), (5) (" 'claim' means (A) right to payment, whether or not such right is ... contingent"); Fed.R.Bankr.P. 1007. A proof of claim filed by a creditor must identify the nature of the claim and include supporting documentation if it exists. 11 U.S.C. §§ 501, 502; Fed. R.Bankr.P. 3001. In order for a plan of reorganization to be confirmed, a disclosure statement containing "adequate information" must be approved by the court. 11 U.S.C. § 1125. Disclosure is equally as significant in the context of claims trading by a trader who is an insider and a fiduciary, who owes a duty of loyalty to the debtor, and who is bound to avoid a conflict of interest. *Wolf v. Weinstein,* 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963).

■■■■ This situation lacks an essential earmark of an arm's length transaction (i.e., disclosure of relevant information) and was inherently unfair to the selling noteholders and prepetition creditors because of the lack of appropriate notice. We are required to "sift the circumstances surrounding any

claim to ensure that injustice or unfairness to creditors does not occur in administration of the bankrupt estate." *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 302 (Bankr.W.D.Pa.1990), citing *Pepper v. Litton,* 308 U.S. at 307–08, 60 S.Ct. at 246. *See also In re Allegheny Int'l., Inc.,* 100 B.R. 241 (Bankr.W.D.Pa. 1988); *Matter of Executive Office Centers, Inc.,* 96 B.R. 642, 649–50 (Bankr.E.D.La. 1988); *In re UVAS Farming Corp.,* 91 B.R. 575 (Bankr.D.N.M.1988). In this case, unfairness caused by CVC's conduct would not be adequately addressed absent application of a per se rule.

■■■■ The usual remedy for the improper purchase of claims at a discount by a fiduciary is to subordinate or disallow the fiduciary's claim to the extent its face amount exceeds the amount paid. *See In re Norcor Mfg. Co.,* 109 F.2d 407 (7th Cir.), *cert. denied* 310 U.S. 625, 60 S.Ct. 898, 84 L.Ed. 1396 (1940). *See also In re Philadelphia & Western Ry. Co.,* 64 F.Supp. 738 (E.D.Pa.1946). We have disallowed CVC's claim to the extent that it exceeds the purchase price.

■■■■ Notwithstanding the foregoing, we find that equitable subordination of CVC's claims is not appropriate. There was insufficient evidence to establish that CVC purchased claims with the intent to harm Debtor or defraud its creditors, despite the result. Although misconduct or wrongdoing is not always a prerequisite for subordinating a claim,[11] subordination must be considered on a case by case basis with due regard to the equities of the particular case. *In re Burden,* 917 F.2d 115, 120 & n. 14 (3d Cir. 1990). The burden of proof with respect to equitable subordination in the case of insiders or fiduciaries has been articulated as the burden of "presenting material evidence of unfair conduct". *In re Nutri/System of Florida Associates,* 178 B.R. 645, 657 (E.D.Pa. 1995). That burden rests with the committee in this case. Once that burden is met, the insider must prove that its transactions with the debtor were fair. Other than conduct by an insider or fiduciary, the burden is to prove that fraud or other culpable conduct occurred. *Id.*

The committee contends that the creditors were harmed because Debtor's filing of the BDK disclosure statement was deliberately delayed by CVC to enable it to purchase claims and make the asset purchase offer. The committee asserts that CVC's claim should be equitably subordinated. CVC contends that the delay was occasioned by (1) the litigiousness of Debtor's landlord, Second Pennsylvania Real Estate Corporation and (2) because financial information concerning one of the subsidiaries, American Technical Industries, Inc., (hereafter "ATI"), was not complete, causing indecision as to whether to include ATI in the plan and the tax ramifications of including ATI. CVC contends that until all information was collected and the tax ramifications were examined, the BDK disclosure statement could not be completed.

Regarding the landlord's claims, the record reflects that the Second Pennsylvania litigation required much of Debtor's counsel's time as well as much court time. Nonetheless, although a disclosure statement could have been structured to account for Second Pennsylvania's claim despite the litigation, Debtor chose not to do so.

Regarding the ATI issue, the record reflects that this matter was an important one which affected Debtor's restructuring proposal, although we note that Debtor filed its plan without a disclosure statement three days after it filed this bankruptcy. Thus, some consideration had already been given to the ATI issue or Debtor could not have proposed its plan.

As this bankruptcy progressed, this court approved extensions of Debtor's exclusive period at Debtor's request because we found, with each request, cause for extension. There was no evidence that CVC engaged in conduct designed to delay the plan process. The evidence showed only that during the delay between the filing of the case and the filing of the disclosure statements CVC was active in its own interests in derogation of its fiduciary responsibility toward Debtor and its estate.

■■■■ Subordination of claims is appropriate only to the extent necessary to offset

---

**11.** *See In re Burden,* 917 F.2d 115, 120 (3d Cir. 1990) (regarding nonpecuniary tax penalty).

any harm to the debtor or other creditors on account of the untoward conduct. *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir. 1977). *Mobile Steel* established a threefold test for the propriety of equitable subordination. There must be (1) inequitable conduct which (2) caused injury to creditors or the debtor or resulted in an unfair advantage to the creditor whose claim is sought to be equitably subordinated and (3) equitable subordination must be consistent with the Bankruptcy Code. 692 F.2d at 700. In the instant case we find that the first two standards have been met but, because of our limitation on the allowance of CVC's claims, equitable subordination is not consistent with the Code. We have previously held that "principles of fairness would be violated if insiders who create an unfair advantage for themselves were permitted to share equally with other creditors." *In re I.D. Craig Service Corp.,* 1991 WL 155750 at *7 (Bankr. W.D.Pa., August 8, 1991). Because we are limiting the allowed amount of CVC's claim to the amount it paid for the claims, with recovery under the plan gauged to that amount, we have adhered to principles of fairness without the necessity of subordinating CVC's claim. The limitation of recovery removes CVC's profit, discourages similar future conduct and provides a recovery on the claims of creditors in CVC's class which is greater than they would have had absent this limitation. It also removes any economic advantage CVC gained over other insiders who honored their duties and did not purchase claims without the appropriate disclosures. Under these circumstances, equitable subordination of CVC's entire claim is not warranted on the evidence in this case. Therefore, we will deny the committee's request for equitable subordination.

By limiting CVC's recovery to the plan percentage as applied to the amount CVC paid for the claims we create a disincentive for insiders to trade in claims without prior disclosure to the sellers, buyers, debtor and creditors involved. It may be that, under some circumstances, nondisclosure will not subject to censure an insider who purchases claims. *See, e.g., In re Federated Dept. Stores, Inc.,* 1991 WL 79143 (Bankr.S.D.Ohio, March 7, 1991) (procedures to safeguard various interests). This is not such a case.

An appropriate Order will be entered.

### JUDGMENT ORDER

And now, to-wit, this **12th** day of **October, 1995,** for the reasons set forth in the foregoing Memorandum Opinion, it is **ORDERED, ADJUDGED AND DECREED** that judgment is entered in favor of plaintiff and against defendant on its First Claim For Relief in that the allowed amount of the claims held by Citicorp Venture Capital, Ltd., is limited to the cost of acquisition and distribution on the claims is controlled by the confirmed Chapter 11 plan. Judgment is entered in favor of defendant and against plaintiff on The Second Claim For Relief seeking equitable subordination and said Second Claim is dismissed with prejudice.

**IT IS FURTHER ORDERED** that the Order dated April 22, 1994, granting partial summary judgment **IS VACATED** and the accompanying opinion is withdrawn.

The Clerk shall close this Adversary.