253 B.R. 385 (2000)
In re PAPERCRAFT CORPORATION a Pennsylvania corporation, Debtor.
Committee of Creditors Holding Unsecured Claims and Committee of Creditors Holding Unsecured Claims as Estate Representative of Papercraft, Plaintiffs,
v.
Citicorp Venture Capital, Ltd. a New York corporation, Defendant.
Bankruptcy No. 91-20903 JKF. Adversary No. 91-2642.
United States Bankruptcy Court, W.D. Pennsylvania.
September 21, 2000.
*386 George M. Cheever, Pittsburgh, PA, for Debtor.
Stephan M. Ray, K. John Shaffer, Los Angeles, CA, and Philip E. Beard, Pittsburgh, PA, for the Creditors' Committee.
Amy M. Tonti, Pittsburgh, PA, Lawrence J. Slattery, New York City, and Jeanette H. Ho, Pittsburgh, PA, for Citicorp Venture Capital, Ltd.

*387 MEMORANDUM OPINION[1]
JUDITH K. FITZGERALD, Chief Judge.
The matter before me is Citicorp Venture Capital, Ltd.'s ("CVC") objection to the Creditors' Committee's post-confirmation fees and expenses submitted pursuant to my Order of April 20, 2000. That Order required the Creditors' Committee to file
(1) a summary of all professional fees and expenses incurred in relation to this adversary that are not included in the $1,248,000 administrative fees incurred during the four-month plan confirmation delay;
(2) a statement of post-confirmation U.S. Trustee fees incurred and/or paid through the date of this Order.
The Creditors' Committee filed its "Summary of Post-Confirmation Date Fees and Expenses Incurred and/or Paid to: (1) United States Trustee; and (2) Professionals in Connection With This Adversary Proceeding" ("Summary of Fees") on May 17, 2000. CVC filed its "Response ... in the Nature of an Objection" ("CVC's Response") on June 15, 2000. I heard argument on July 12, 2000.
The Creditors' Committee requests that CVC's claims be subordinated by the following amounts:
1. The profit on CVC's illegal claims trading, in the amount of $5,434,058.12 ...
2. The additional administrative expenses incurred by the Papercraft estate during the four-month delay in confirmation of the BDK Plan, in the amount of $1,248,000 ...
3. Interest and dividends lost by creditors during the four-month delay in confirmation of the BDK Plan, in the amount of $956,250 ...
4. United States Trustee fees incurred and/or paid by the Papercraft estate from the date of confirmation through May 2, 2000, in the amount of $16,900 ...
5. Additional professional fees and expenses incurred and/or paid by the Papercraft estate or BDK from February 14, 1992, through April 30, 2000, in the amount of $2,974,373.15 ... and[2]
6. Such other and further relief as this Court deems appropriate.
Summary of Fees, Adv. Docket No. 209, at 7.
The parties agreed at the hearing on July 12, 2000, that the amount of U.S. Trustee fees at issue is $4,750, not the $16,900 originally claimed. I will enter an order reflecting the parties' agreement on this point.
Many of CVC's objections merely restate the issues that were litigated, appealed, and dealt with by me on remand. However, in light of the parties' most recent submissions, the following points require additional explanation.[3]
*388 Delay in Confirmation
CVC cites to the transcript of a hearing before me held on August 29, 1991,[4] in support of its argument that I granted an extension of the exclusive period to file the plan of reorganization based on the existence of pending litigation with Debtor's landlord, Second Pennsylvania Real Estate Corporation ("Second Pennsylvania"). According to CVC, in light of the Second Pennsylvania litigation, the earliest the plan could have been confirmed was the last week of November of 1991, less than two months before the actual confirmation date of January 21, 1992. See CVC's Response, Adv. Docket. No. 211, at notes 6 through 10 and accompanying text. However, at the August 1991 hearing, in addressing the existence of the Second Pennsylvania litigation and its effect on the progress of the case, counsel for the Debtor stated that the Debtor did "not intend to be paralyzed by the prospect of litigation with Second Pennsylvania", Transcript of August 29, 1991, at 5, and "assure[d] the Court that one way or another a plan will be filed by September 18 [1991]." Id. at 4. Nonetheless, I extended the exclusive period one week, from September 18 to September 25. This Adversary complaint was filed a month later, on October 31, 1991.
At the trial on this matter, on November 15, 1994, I noted that the plan could have been confirmed despite the problem with Second Pennsylvania. Transcript of November 15, 1994, Adv. Docket No. 159, at 84.[5] Furthermore, Kenneth Klee, formerly of Stutman, Treister & Glatt, lead counsel for the Creditors' Committee in the Adversary, testified that, based on entries in Debtor's counsel's fee application which indicated the amount of time spent on Second Pennsylvania litigation and the disclosure statement between March or April and October of 1991, the delay in preparing the disclosure statement in this case was not the result of the Second Pennsylvania litigation. Transcript of November 15, 1994, at 84, 86-90.[6]
There also existed an issue regarding American Technical Industries, Inc. ("ATI") but it was addressed in the BDK plan filed shortly after the case was commenced. See In re Papercraft Corporation, 187 B.R. 486, 501 (Bankr.W.D.Pa. 1995), where I found that consideration had been given to the ATI issue prepetition and, therefore, this was not cause for the delay in filing the disclosure statement. Based on the record, I concluded that the Second Pennsylvania and ATI issues did not account for the delay in filing the disclosure statement in this case. No other explanation for the delay was offered. The only other event occurring at the time was the undisclosed purchase of notes by CVC in breach of its fiduciary duty.[7] "There is nothing unusual about a court finding credible one plausible explanation of the significance of documentary evidence." Papercraft Corporation v. Citicorp Venture Capital Ltd., 160 F.3d 982, 989 n. 5 (3d Cir.1998). The evidence amply supports the conclusion that the delay was the result of CVC's claims purchasing *389 activities.[8]
Amount of Interest
I have reexamined the evidence with respect to the amount of interest attributable to the delay and conclude that Mr. Victor's assessment of lost interest income in the amount of $956,250 is appropriate. Mr. Victor's Declaration provides that
In connection with the BDK Plan, creditors received new debt securities with a face value of $33,750,000 with an annual interest rate on the debt securities of 8.5%. On a monthly basis, this translates into $239,062 of lost income incurred as a result of the delay in confirming the BDK Plan. Again, assuming a four month delay due to the actions of CVC, the cost to creditors in the aggregate is $956,250.
Victor Declaration, supra, at ¶ 26b. The calculation is:
$33,750,000 × .085% = $2,868,750 interest per year
$2,868,750 ÷ 12 months = $239,062.50 interest per month
$239,062.50 × 4 months = $956,250
The Creditors' Committee argued at the July 12, 2000, hearing that Mr. Victor's calculation of lost income was correct because the securities from which the interest stemmed have not been issued as the result of this litigation with CVC. The four month period Mr. Victor referred to occurred preconfirmation and is the period in which the plan was not confirmed but should have been. The order confirming the plan provides that "The BDK Notes shall accrue interest from the Effective Date and shall mature 10 years from the Effective Date." Order Confirming Plan at 10, ¶ 12.[9] The plan fixes the term in which the notes will be held at interest and not distributed to creditors. Thus, but for CVC's conduct, the plan could have been confirmed at least four months before it was, the securities would have been issued four months earlier, the interest would have begun and the distribution of principle and interest would have been made four months before it now will be. Hence, creditors have lost the ability to use their money from the distribution for four months.
CVC argues that what was "lost" was only interest on the $956,250 because the principle investment will earn the same amount of interest over the ten-year investment term. At first blush, CVC's argument seems meritorious. Upon further analysis, however, it fails. The investment term itself is delayed in implementation for four months which, once expired, cannot be recaptured. Time lost cannot be regained. Under the Creditors' Committee's analysis, the four month period is treated as a preconfirmation delay. Under CVC's analysis, it is a post-confirmation delay. Under either analysis, the $33,750,000 principle earns $956,250 in simple interest at 8.5 percent over four months. Because the creditors will be forever *390 deprived of the use of their funds for four months as the result of CVC's conduct, they are entitled to recoup the 8.5 percent rate of return utilized in the plan as the measure of lost earnings.[10] CVC's claim will be equitably subordinated by the $956,250.
Amount of Fees and Expenses
CVC makes various arguments as to why the fees and expenses itemized by the Creditors' Committee should be reduced, if considered at all, on the grounds that not all of them can be attributed to CVC's conduct. I find, however, that none of the amount at issue incurred during the preconfirmation delay or associated with the Adversary would have been incurred but for CVC's conduct. Therefore, all of it is attributable to CVC and CVC's claim is to be subordinated by that amount. Accordingly, CVC's argument for reduction in the fees and expenses is rejected.
American Rule
CVC also argues that the subordination of its claim should not include the amount of the Creditors' Committee's fees because under the American rule litigants are to bear their own attorneys' fees absent statutory or contractual authorization. See Davies v. Continental Bank, 1989 WL 63235 at *5, M.D.L. No. 745, CIV. A.Nos.86-6508, 86-7516 (E.D.Pa.1989). See also Hall v. Cole, 412 U.S. 1, 4, 93 S.Ct. 1943, 1945, 36 L.Ed.2d 702 (1973). The American Rule does not apply to the circumstances at issue. The Creditors' Committee isn't asking for payment of attorneys' fees as such. Rather, the fees at issue depleted funds otherwise available to creditors of this estate due to CVC's conduct in breach of its fiduciary duty. That is, CVC's conduct caused the amount available to the estate to pay creditors to be reduced. To assure the creditors the distribution they should have received but for CVC's conduct, I find it necessary to restore the fund by subordinating CVC's share of distribution by the amount of fees and expenses incurred by professionals who are to be paid from estate assets that would not have been incurred but for CVC's breach of its fiduciary duty.
Conclusion
In accordance with the foregoing and the opinion of the Court of Appeals, CVC's maximum recovery cannot exceed $10,553,541.88.[11] Based on the foregoing and using the $10,553,541.88 as the starting point, its recovery is further subordinated by lost interest income of $956,250, administrative costs of $1,248,000 incurred during the delay in plan confirmation, fees and costs through April 30, 2000, of $2,974,373.15, and post-confirmation U.S. Trustee fees of $4,750. These amounts total $5,183,373.15. Thus, CVC's unsubordinated distribution will be $5,370,168.73.
An appropriate order will be entered.
NOTES
[1] The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.
[2] Since the Creditors' Committee filed its Summary of Fees the 26th Report on Compensation Paid and Expenses Reimbursed to Professionals has been filed showing a total of post-confirmation professional fees in the amount of $3,282,859.76. Adv. Docket No. 951.
[3] CVC argues at note 1 of its Response to the Creditors' Committee Summary of Post-Confirmation Fees and Expenses that it has not profited and that the "imaginary paper profit" is based on a "hypothetical estimated intrinsic value" which did not reflect the market value of the BDK units. At trial and again in my Memorandum Opinion of April 20, 2000, I rejected CVC's method of valuation of the BDK units. Its renewed argument in this respect is without merit.

CVC also argues that it should be paid its claim in full because if CVC had not bought claims, its share would have gone to the selling noteholders anyway and, therefore, creditors were not harmed. This argument is without merit inasmuch as CVC breached its fiduciary duties in purchasing the claims and is precluded from benefitting as a result of its conduct.
[4] This transcript is reprinted in Volume 2 of CVC's Appendix to its brief on remand as Exhibit 3.
[5] The cover page of this transcript incorrectly reads "November 15, 1995".
[6] See note 5, supra.
[7] I note that at the August, 1991, hearing neither Debtor nor CVC disclosed CVC's efforts to acquire financial information and its trading in claims. Thus, the court was not given the complete picture of the circumstances that caused delay at that time. As I found in my opinion of April 20, 2000, Debtor's filing of competing plans, when a prenegotiated plan was filed at the outset of the case, is unusual. The fair inference from the events is that CVC used its status on Debtor's board of directors and on Debtor's affiliates' boards of directors, together with its then newly acquired vote blocking position for the BDK plan to influence Debtor to file the CVC plan, thereby delaying the entire process. In re Papercraft Corporation, 247 B.R. 625, 629-30 (Bankr.W.D.Pa.2000).
[8] After the BDK disclosure statement was approved, the plan confirmation hearing was set but CVC used its new position as a noteholder to assert objections to the plan, despite having participated in approving it prepetition. Although CVC's assertion of objections to the plan did not necessarily cause a delay between the filing of the disclosure statement and confirmation of the plan, its conduct led to increased professional fees in this case because its objections had to be addressed and plan language changed to reflect a compromise reached by the parties.
[9] The Plan defines "Effective Date" as "the date on which this Plan shall take effect, as provided in sections 6.19 and 12.2 of this Plan...." BDK Plan at 5. Section 6.19 refers to mergers that would take place before the Effective Date. Section 12.2 states that "Except as provided in section 6.19 or ARTICLE XI, paragraph p., the Effective date ... shall occur ... on the first Business Day on which no stay of the Confirmation Order is in effect that is more than ten (10) days ... after the Confirmation Date" and the mergers. Article XI concerns retention of jurisdiction to, inter alia, determine rights to distribution pursuant to the Plan (¶ d) and to resolve any disputes concerning implementation of the Plan (¶ f).
[10] In reality, the creditors will also lose interest on the $956,250 interest earnings and will be forever deprived of the opportunity to use their principle and interest for four months. Lost opportunity damages, however, must be nonspeculative. See Hershock v. Fiascki, 1992 WL 164739 (E.D.Pa.1992). I cannot assess what those damages will be.
[11] CVC's claim based on the face value of its purchases was $60,849,299.10 and, if nothing was subordinated, its recovery under the confirmed plan would be $15,989,676.56.