**In re JERSEY MATERIALS CO.**

Nos. 2982—a/2824.

District Court, D. New Jersey.

June 26, 1943.

John H. Pursel, of Phillipsburg, N. J. (John F. Oldt, of Easton, Pa., of counsel), for mortgagee Walter L. Connor.

Wayne Dumont, II, of Phillipsburg, N. J., for trustee.

FORMAN, District Judge.

In 1933 the Jersey Materials Company, the bankrupt, was formed by D. Herbert Schweyer, who became its president, and Israel Krohn, its secretary and treasurer. It dealt in marble chips, talc, crayon and chalk, owning a quarry located at Phillipsburg, New Jersey.

It bought its property from John Wagner Green and Henry Green, giving in part payment a real estate mortgage in the sum of $3,500, dated July 1, 1933, payable in four years. The mortgage was not paid at maturity and, in fact, the bankrupt ceased to pay interest which is due from July 1, 1936, at the rate of six per cent.

In 1941 the affairs of the bankrupt were in a precarious state but an agreement was concluded between it and the owners of the mortgage, the pertinent terms of which are as follows:

"Whereas, the Party of the First Part [Jersey Materials Company] proposes to refinance its business, for which purpose it has caused its charter to be amended so that it may be authorized to issue preferred stock to the amount of $25,000.00, the proceeds whereof to be used for the purpose of retiring existing liens and encumbrances against the property, its outstanding loans and business indebtednesses, and the balance thereof to be employed as working capital; and

"Whereas, the Parties of the Second Part [the Greens] have agreed to accept preferred stock of the said Corporation,

Party of the First Part, in exchange for the Bond and Mortgage held by them:

"Now, therefore, in consideration of the premises and of the covenants hereinafter expressed, the said Parties to this Agreement do hereby mutually agree as follows:

"(1). That the authorized preferred stock of the company shall not be increased over $25,000.00 without the consent of the Parties of the Second Part.

"(2). That the Party of the First Part will pay and satisfy all tax liens against the said mortgaged property, as well as pay and satisfy the outstanding tax title by procuring either the cancellation thereof, or re-conveyance of the title to the Jersey Materials Company, so that the title to the said premises shall be free and unencumbered.

"3. The Party of the First Part shall place no mortgage against the said real estate without the consent of the Parties of the Second Part.

"4. The Party of the First Part shall re-assign to the Parties of the Second Part, all that certain stock of the Alm Syndicate originally delivered to the Party of the First Part by the Green Estate.

"5. The Parties of the Second Part agree to accept preferred stock of the Jersey Materials Company, at par, to the amount of the principal and accumulated interest due upon the Bond and Mortgage held by them against the property of the Party of the First Part, and upon the receipt thereof, will satisfy and cancel of record in the Clerk's Office of Warren County, New Jersey, the Bond and Mortgage in the principal amount of $3,500.00 hereinbefore referred to and held by them, the said Parties of the Second Part."

Schweyer and Krohn were practically the sole owners of the bankrupt corporation except for shares held by other members of their families. They were at odds and the feeling between them intensified after the execution of the foregoing agreement.

On October 17, 1941, the mortgage was assigned by the Greens to Walter L. Connor for the sum of $1,600. Connor also paid the sum of $100 for attorneys' fees and other costs in his purchase of the mortgage.

On February 16, 1942, an involuntary petition in bankruptcy was filed against the Jersey Materials Company and it was adjudicated a bankrupt on March 5, 1942.

Connor claims the lien of the $3,500 mortgage, together with interest from 1936 in the sum of about $1,400, or an approximate aggregate figure of $4,900.

The trustee resisted the lien of the mortgage before the referee and the referee allowed the mortgage held by Connor as a lien against the real estate of the bankrupt only to the extent of $1,700 which he paid for it, together with interest upon his payment.

The matter is before me on a petition to review the order of the referee.

The circumstances under which Connor became possessed of the mortgage form the basis of the controversy. Schweyer and Connor were old friends. Connor was familiar with the affairs of the bankrupt company and the widening breach between Schweyer and Krohn. This had grown to the point where there was complete lack of cooperation between the two principal proprietors of the corporation.

The necessary arrangements to carry out the agreement with the Greens had not been fully consummated as between them and certainly no tender was ever made by the corporation to the Greens to complete the agreement, which would have transferred the status of the Greens from that of mortgagees to preferred stockholders.

Schweyer was in communication with the Greens about the disposition of their mortgage and, in fact, received a telephone call from one of them at the house of Connor where he was visiting in October of 1941. He told Connor immediately upon the termination of the telephone conversation that the Greens were willing to sell their mortgage at a decided discount. He urged Connor to buy the mortgage because he had been advised by his lawyer that as a director of the Corporation he could not legally make the purchase himself.

Connor had no money with which to make the purchase although he recognized that the sum necessary to satisfy the Greens, namely, $1,600, was a cheap price. Thereupon, Schweyer agreed to lend him the money to purchase the mortgage and subsequently arrangements were made by Schweyer with an attorney to oversee the transfer of the mortgage from the Greens to Connor.

Schweyer secured credit at a bank in the sum of $2,000 by way of a note, the full proceeds of which came into the hands of Connor who paid the consideration of $1,-

600 plus $100 in lawyers' fees and costs and returned $300 to Schweyer. Connor says that at the time of the transaction he expected to be able to repay Schweyer out of the proceeds of a claim for reimbursement for hospitalization costs which he had paid on account of an injury to his son, occurring as a result of an accident. Both Connor and Schweyer testified that Schweyer had no interest whatsoever in this transaction.

The referee found nothing of an illegal character in this transaction and placed his decision to reduce the lien of the mortgage upon the ground that at the time Connor took the mortgage he did so subject to any outstanding equities against it. The referee felt that an equity "attached to this mortgage which would prevent Connor from recovering more on the mortgage than he actually paid for it". He held in effect that had the Greens endeavored to foreclose their mortgage in the face of the agreement which is above set forth, the Jersey Materials Company could have resisted the foreclosure and compelled them to take preferred stock. Connor, in his opinion, stood in no better position than the Greens and could only recover to the extent of his actual payment for the mortgage.

Connor takes issue with the decision of the referee on the grounds that the Jersey Materials Company is estopped from asserting the validity of the agreement because in fact the agreement was never delivered to the Greens; the agreement was executory and since the Jersey Materials Company did not carry out its obligations under the agreement it was never entitled to demand performance upon the part of the Greens; on and after March 5, 1942, the date of the adjudication in bankruptcy, the Jersey Materials Company had rendered itself incapable of performing the agreement; and that the order of the Referee was contrary to the evidence.

■ I am inclined to agree with the arguments made by Connor that the referee's holding in this regard cannot be sustained because Jersey Materials Company never acquitted itself of its obligations under the contract with the Greens in a manner that would place it in a position to assert estoppel against the Greens or their bona fide assignee. I realize the contract had no time limit fixed in it but there were a number of commitments undertaken by the Jersey Materials Company. The contract contemplated that the Jersey Materials Company would reorganize its financial structure by the issuance of preferred stock to the amount of $25,000, the proceeds of which were to be used for the purpose of retiring existing liens and encumbrances against the property, its outstanding liens and business indebtednesses, and the employment of the balance as working capital. Under these circumstances the Greens were to deliver up their mortgage and become preferred stockholders. The Jersey Materials Company was to reassign to the Greens stock of the Alm Syndicate, originally delivered to it by the Green Estate. The tax liens were to be paid and satisfied and an outstanding tax title was to be procured by either cancellation thereof or the reconveyance of it to the Jersey Materials Company so that the title to its premises would be free and unencumbered. Beyond providing for the authorization to issue the preferred stock, because of the friction between Schweyer and Krohn no further action was taken by the Jersey Materials Company to place itself in position to acquire the Greens' mortgage. The declination by the Jersey Materials Company or its inability to ·fulfill its commitments under the contract was communicated to the Greens by Schweyer. They assigned their mortgage and bankruptcy of the Jersey Materials Company ensued.

Therefore, I cannot see that there was reserved to the Jersey Materials Company any equity under this contract as found by the referee which would have prevented the Greens from pursuing their remedy of foreclosure.

On the other hand, I cannot agree with the referee's holding that the status of Connor, in so far as his association with Schweyer is concerned, was one without the taint of collusion.

■ Schweyer, in his capacity as president and director of Jersey Materials Company, had the responsibility of a fiduciary or quasi fiduciary to the stockholders of his company during its solvency and when it became insolvent this responsibility was extended to its creditors. When he imparted to Connor the information that his company's mortgage could be bought at a bargain and withheld this information from his co-director and stockholder he did not fairly execute the duties of his trust. Connor, on the other· hand, was admittedly thoroughly cognizant of all of the condi-

tions and circumstances surrounding Schweyer's activity and his status and that of the corporation itself.

Schweyer was a close friend of Connor. When he desired to form another corporation known as the General Crayon Company at about the time of this mortgage transaction in 1941, Connor acted as one of the incorporators for him. Schweyer consulted counsel and knew that as a director of the Jersey Materials Company he held a position of a fiduciary nature and that he could not with propriety close the bargain with the Greens for the mortgage at a greatly reduced amount for his personal advantage. Connor was fully conversant with the affairs of the Jersey Materials Company, knew of its insolvent condition and knew also of the disintegrating relationship existing between Schweyer and Krohn. Schweyer told Krohn nothing concerning the opportunity to purchase the mortgage security at about one-third of its face value with interest. He advanced his own money to Connor with which to make the purchase. There is the testimony of Schweyer and Connor that Schweyer had no interest in the mortgage but this would be their likely statements if the purchase was being made by Connor for Schweyer or at least for him to have an interest in the transaction. Schweyer's action is so inconsistent with the ordinary conduct of a businessman under circumstances such as those present that it challenges credulity. Schweyer himself is a creditor of the bankrupt although Krohn is a much larger creditor. His beneficent friendship in introducing Connor to the transaction whereby he would stand to make such a substantial profit as against the corporation's creditors cannot be accepted as his motive in the light of the fact that it was his money that made possible Connor's purchase. When he required someone to accept stock for the purpose of forming a corporation, Connor was the available dummy. In the instance of the acquisition of the Green mortgage it seems certain that Connor again was acting for or with him.

██ I realize that fraud and collusion must not be presumed nor should it be de-

duced on the basis of mere suspicion. The burden of proving it rests upon the party pleading it and that proof should be clear and convincing. In this case we have as direct evidence the testimony of Schweyer and Connor that the transaction was a bona fide purchase of the mortgage to enure entirely to the benefit of Connor. On the other hand, we have a chain of circumstances showing conclusively that Schweyer felt aggrieved at the activity of his colleague in the corporate enterprise, Krohn, and anticipated the dissolution of the corporation. He knew that the mortgage could be bought at a bargain and failed to communicate it to the corporation. Instead, he chose to communicate this information to his friend, Connor, and to make available out of his own funds every penny necessary to carry out the transaction. These, and the other circumstances which have been mentioned heretofore, point to a course of action inconsistent with the direct statements of Schweyer and Connor but entirely consistent with a course of conduct of a corporate officer who desired to benefit by controlling his corporation's secured evidence of indebtedness. The old adage that actions speak louder than words seems to have peculiar applicability here.

██ I am persuaded that Connor purchased the mortgage from the Greens with the intent that Schweyer should benefit thereby and that under such circumstances Connor should recover from the bankrupt estate no more than the sum of money paid by him for the mortgage, together with interest from the date he paid it.

██ In arriving at my conclusion I have not overlooked the provisions of No. 47 of the General Orders in Bankruptcy.[1] Ordinarily, if the referee's finding is based upon conflicting evidence involving questions of credibility and the referee has actually heard the witnesses, great weight must be attached to his conclusions and they should not be disturbed unless there is a most cogent evidence of mistake and miscarriage of justice. In this case, however, the referee's conclusions are ultimate findings based upon substantially undisputed facts which need not be accorded so con-

---

[1] "Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous. The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." 11 U.S.C.A. following section 53.

clusive an effect. The assertions of Schweyer and Connor as to the sole interest of Connor in the purchase are undisputed and the circumstances surrounding the purchase are likewise undisputed. I am constrained to infer from this conflict a conclusion which differs from the inference drawn by the referee and this is not beyond the power of the reviewing court.

"The judge is not bound by the findings of the referee when no serious contradictions are in the evidence. On uncontradicted evidence, the judge or an appellate court is in as good a position as the referee to make findings of fact." Remington on Bankruptcy, Vol. 8, 5th Ed., § 3718, p. 33; Walter v. Atha, 3 Cir., 262 F. 75.

Accordingly, the order of the referee will be affirmed but upon the reasons set forth herein.