In re PAPERCRAFT CORPORATION, a Pennsylvania corporation, Debtor.

CITICORP VENTURE CAPITAL, LTD., a New York corporation, Appellant/Cross–Appellee,

v.

COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS and Committee of Creditors Holding Unsecured Claims, as Estate Representative of Papercraft Corporation, Appellee/Cross–Appellant.

Civil Action Nos. 95–1872, 95–1886.
Bankruptcy No. 91–20903.
Adversary No. 91–2642.

United States District Court, W.D. Pennsylvania.

Aug. 7, 1997.

Scott J. Davido, Jones, Day, Reavis & Pogue, Pittsburgh, PA, Paul K. Vey, Pietra-gallo, Bosick & Gordon, Pittsburgh, PA, Richard I. Werder, Jr., Jones, Day, Reavis & Pogue, Cleveland, OH, Shelly Crocker, Perkins Cole, Seattle, WA, Lawrence Slattery, Citcorp Legal Affairs, New York City, for Citicorp Venture Capital, Ltd. in No. 95-1872.

George M. Cheever, Kirkpatrick & Lockhart, Pittsburgh, PA, Philip E. Beard, Stonecipher, Cunningham, Beard & Schmidt, Pittsburgh, PA, Stephen M. Ray, K. John Shaffer, Stutman, Treister & Glatt, Los Angeles, CA, for Committee of Creditors holding unsecured claims and Committee of Creditors holding unsecured claims, as estate representatives of Papercraft Corp. in No. 95–1872.

David Siegel, Ashok W. Mukhey, Peter J. Gregora, Irell & Manella, Los Angeles, CA, for BDK Holdings.

Scott J. Davido, Jones, Day, Reavis & Pogue, Pittsburgh, PA, Paul K. Vey, Pietragallo, Bosick & Gordon, Pittsburgh, PA, Richard I. Werder, Jr., Jones, Day, Reavis & Pogue, Cleveland, OH, for Citicorp Venture Capital Ltd. in No. 95-1886.

Philip E. Beard, Stonecipher, Cunningham, Beard & Schmidt, Pittsburgh, PA, Stephen M. Ray, K. John Shaffer, Stutman, Treister & Glatt, Los Angeles, CA, for Committee of Creditors holding unsecured claims and Committee of Creditors holding unsecured claims, as estate representatives of Papercraft Corp. in No. 95–1886.

## MEMORANDUM OPINION

CINDRICH, District Judge.

This action arises from an October 12, 1995 Memorandum Opinion and Order (collectively referred as the "October 12 Order") of the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court"), Bankruptcy Judge Judith K. Fitzgerald presiding. *In re Papercraft Corp.,* 187 B.R. 486 (Bankr.W.D.Pa.1995). Pending before the Court is an appeal and cross-appeal of the October 12 Order by Appellant and Cross–Appellee Citicorp Venture

Capital, Ltd. ("CVC") and Appellee and Cross–Appellant Committee of Creditors Holding Unsecured Claims and Committee of Creditors Holding Unsecured Claims as Estate Representative of Papercraft Corporation (the "Committee").[1] This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 158(a)(1) and in accordance with Bankruptcy Rule 8001 as the appeal and cross-appeal arise out of a final judgment entered by the Bankruptcy Court.

## I. *Facts*

We begin by reciting the Bankruptcy Court's findings of fact.

The following facts were established by stipulation of the parties or from the evidentiary record:

1. In 1985, Debtor, [Papercraft Corporation], completed a leveraged buyout (LBO) with the assistance of an affiliate of CVC.

2. The LBO transformed Debtor from a publicly traded company into a wholly-owned subsidiary of Amalgamated Investment Corporation (hereafter "Amalgamated").

3. CVC acquired a 28% equity position in Amalgamated as a result of the LBO. It wrote off the equity position in 1987 because it expected no return on its investment.

4. At all relevant times, a representative of CVC sat on the boards of directors of Amalgamated, Debtor, Barth & Dreyfuss and Knomark, subsidiaries of Debtor. After 1989, that representative was CVC's Vice President, M. Saleem Muqaddam, who served on the boards of those companies.

5. Barth & Dreyfuss and Knomark were subsidiaries of Debtor at all relevant times.

6. In April of 1989, Debtor completed a restructuring of its debt which resulted in an exchange of approximately 98% of Debtor's debentures for unsecured First Priority and Second Priority notes.

7. The First Priority Notes were issued under an Indenture dated May 15, 1989, and were to mature on October 1, 1994. An aggregate amount of $90,717,398 (principal plus accrued interest) was outstanding on the date Debtor's chapter 11 case was filed.

8. The Second Priority Notes were issued under a separate Indenture, also dated May 15, 1989, and were to mature on April 1, 1995. An aggregate amount of $56,318,-767 (principal plus accrued interest) was outstanding on the date the chapter 11 case was filed.[2]

9. Debtor was unable to meet the terms of the notes. Therefore, in the fall of 1990, Debtor sought another restructuring of its unsecured debt and began pre-bankruptcy negotiations with creditors who were part

---

1. The Committee is the official unsecured creditors' committee in Papercraft's chapter 11 case, whose members were duly appointed by the United States Trustee under section 1102 of title 11 of the United States Code ("Bankruptcy Code"). The Committee has sued CVC not just in its capacity as a committee entitled to bring suit by virtue of sections 502, 1103, and 1109 of the Bankruptcy Code, but as "Estate Representative" which, under the provisions of the confirmed plan of reorganization, is entitled to enforce the rights of the estate and is empowered by section 1123(b)(3)(B) of the Bankruptcy Code to do so. Opening Brief of Appellee and Cross–Appellant, Committee Of Creditors Holding Unsecured Claims And Committee Of Creditors Holding Unsecured Claims As Estate Representative Of Papercraft Corporation ("Committee's Opening Br") (Doc. No. 4) at 1 n. 1.

2. On the date of the Chapter 11 filing, the holders of First and Second Priority notes included the following: (1) Acacia Mutual Life Insurance Co. ("Acacia"); (2) American Money Management ("American Money"); (3) Drexel Burnham Lambert ("Drexel"); (4) Executive Life Insurance Co. ("Executive"); (5) First Capital Life Insurance Co. ("First Capital"); (6) First Investors; (7) First Stratford Life Insurance Co. ("First Stratford"); (8) Magten Asset Management Corp. ("Magten"); (9) Oppenheimer & Co. ("Oppenheimer"); (10) Pan American Life Insurance Co. ("Pan American"); (11) Presidential Life Insurance Co. ("Presidential Life"); (12) the Resolution Trust Corp. ("the RTC"); (13) Transmark U.S.A. Inc. ("Transmark"); and (14) Venture Advisors ("Venture"). Appellant/Cross–Appellee's Brief In Support Of Appeal Of Order Limiting Recovery On Purchased Claims ("CVC's Opening Br") (Doc. No. 2) at 10 n. 7.

of what has been termed in this case the "Informal Committee".[3]

10. After several months of prepetition negotiations, Debtor and the Informal Committee reached an agreement on what is called herein the BDK Plan of Reorganization which was to be filed in conjunction with a chapter 11 case.

11. The BDK Plan would effect a reorganized enterprise and was unanimously approved by Debtor's board, including CVC through Muqaddam, in March of 1991.

12. Debtor filed a voluntary chapter 11 petition on March 22, 1991.

13. At that time, CVC held none of Debtor's First or Second Priority Notes and was not a creditor of Debtor.

14. Debtor was insolvent on the filing date and all relevant times thereafter.

15. On March 25, 1991, three days after this bankruptcy began, Debtor filed the BDK Plan, without a disclosure statement. A disclosure statement was not filed until October 15, 1991.

16. In March of 1991, Muqaddam sought the approval of CVC's Investment Committee for CVC to purchase Papercraft notes.

17. On April 1, 1991, CVC's Investment Committee granted approval for CVC to purchase up to $10 million of Papercraft notes.

18. In early May, 1991, Muqaddam prepared a review of CVC's investment in Amalgamated.

19. CVC purchased $60,849,575.72 face value of the Papercraft notes for $10,553,-541.88 between April and August of 1991. Approximately $7.4 million (more than 70%) of CVC's purchases of Papercraft

notes were made on or after August 19, 1991.

20. CVC acquired 38.3% of Debtor's First Priority Notes, 46.4% of Debtor's Second Priority Notes, and 40.8% of Debtor's total unsecured claims.

21. CVC neither requested nor obtained the approval of Debtor's board, the [C]ommittee[4], or the court to buy the notes. [FN1]

FN1. On or about May 23, 1991, while it was a member of the [C]ommittee, Magten purchased, on behalf of clients, approximately $3.8 million in Second Priority Notes from Oppenheimer & Co. for approximately $379,000. Oppenheimer was a member of the Informal Committee and acknowledged in writing that it knew Magten was the purchaser. Magten also made other offers to purchase Papercraft notes, again on behalf of clients. In January, 1991, Magten entered into a settlement agreement by which it agreed to receive no more than its cost of these claims at the time of distribution under the plan. Magten disclosed to those entities from which it purchased notes its position with the committee and the bankruptcy. Unlike CVC, Magten had disclosed its identity and connection with Debtor. Furthermore, Magten was not buying notes for its own account, as was CVC, but for accounts of its customers.

22. Debtor learned of CVC's initial purchases of notes by May, 1991, that is, after CVC made the purchases. Its counsel became aware that CVC had purchased some claims by June of that year. Debtor and its counsel also learned of CVC's later purchases.

23. In April of 1991, the committee heard a rumor that CVC was purchasing claims.

---

3. The members of the Informal Committee included the following: (1) Acacia; (2) American Money; (3) Columbia Savings & Loan Co.; (4) Drexel; (5) Executive; (6) Far West Savings & Loan; (7) Fidelity Bankers Life Insurance Co.; (8) Magten; (9) Oppenheimer; (10) Pan American; (11) Transmark; and (13) Venture. CVC's Opening Br at 9 n. 5.

4. The members of the Committee included the following: (1) Acacia; (2) Drexel; (3) Executive; (4) First Capital; (5) Guarantee Security Life Insurance Co.; (6) J.F. Karlton Company; (7) Second Pennsylvania Real Estate Corporation; (8) Magten; (9) Pan American; (10) Presidential Life; (11) the RTC; and, (12) Transmark. CVC's Opening Br at 9 n. 6.

The committee heard no more about it until CVC made its asset purchase offer in September of 1991. Neither CVC nor Debtor communicated to the committee the status or extent of CVC's purchases.

24. CVC acquired the RTC's First Priority and Second Priority Notes for 25 cents and 12 cents on the dollar, respectively. Magten unsuccessfully bid for the notes at 20.5 cents and 10.5 cents. When CVC bought the RTC's notes, Muqaddam estimated that the RTC controlled approximately 20% of Debtor's total unsecured claims.

25. At the values established by this court at the BDK plan confirmation hearing, noteholders received an interest in BDK Units equal to 33.5 cents on the dollar for First Priority. Note claims and 16.75 cents on the dollar for Second Priority Note claims.

26. At Muqaddam's direction, and with the knowledge and consent of Debtor's management, two employees of CVC, Noelle Cournoyer and Nils Havgestad, visited Barth & Dreyfuss in January or February of 1991. The purpose of the visit was to obtain information about the company in the event that CVC decided to make an asset purchase proposal. During their 1 1/2 day visit, CVC's representatives obtained current Barth & Dreyfuss financial statements, looked at the company's product lines, discussed the company with its management, and toured the plant.

27. Cournoyer prepared a written report on Barth & Dreyfuss, drafts of which were provided to Debtor, but not to the [C]ommittee.

28. Frank Kane, the Chief Financial Officer of Debtor, reviewed drafts of the Barth & Dreyfuss report and gave his comments to Muqaddam. Kane did not discuss the report with or provide it to the [C]ommittee.

29. Kane, Muqaddam, and a representative of the Bank of New York Credit Corporation (BNYCC), a Barth & Dreyfuss lender, held a meeting on June 14, 1991.

At that meeting, Muqaddam made a presentation to BNYCC for financing a possible purchase of Barth & Dreyfuss and Knomark by CVC.

30. At some point during or after the meeting, Muqaddam gave BNYCC a copy of the Barth & Dreyfuss report and a one page summary of a possible structure for an asset purchase transaction.

31. Muqaddam received a financing term sheet from BNYCC dated August 12, 1991. He provided a copy of the term sheet to Kane and obtained Kane's comments on the term sheet. CVC agreed to the terms.

32. After the filing of the bankruptcy, Debtor, through Kane and Andre Francois, Debtor's manager of corporate accounting, reviewed documents prepared by CVC and prepared documents for Muqaddam and Cournoyer with respect to the proposed asset purchase.

33. Chanin and Company was the financial advisor to the [C]ommittee. On July 18, 1991, Debtor's Chief Executive Officer, Michael Arnold, faxed Chanin and Company's enterprise valuation to Muqaddam. Arnold received the valuation on July 16, 1991.[FN2]

FN2. The parties stipulated to July 16, 1994, but the 1994 date may be a typographical error. The date that Arnold received the information is not material, however. The pertinent fact is that Muqaddam received Chanin and Company's enterprise valuation from Arnold.

34. Kane faxed Chanin and Company's distressed sale analysis to Muqaddam on August 6, 1991.

35. At Muqaddam's request, Debtor engaged Arthur Andersen & Co. to analyze whether CVC's note purchases would have any adverse tax effect on Debtor.

36. Debtor received a written tax analysis from Arthur Andersen & Co. dated August 26, 1991. Kane faxed a copy of the tax analysis to Muqaddam.

37. Muqaddam prepared a memo to CVC's Investment Committee dated Au-

gust 23, 1991, requesting authority to make an offer to purchase the valuable operating subsidiaries of Debtor, i.e., Barth & Dreyfuss and Knomark.

38. Thereafter, in August of 1991, CVC's Investment Committee granted Muqaddam authority to cause CVC to make an asset purchase offer.

39. On August 26, 1991, Muqaddam sought and obtained the approval of CVC's Investment Committee to increase note buying authority from $10 million to $15 million.

40. In the week before CVC made its asset purchase offer, that is, before September 13, 1991, Muqaddam called Pamela Cascioli, chairperson of the [C]ommittee, and informed her that CVC was contemplating making an offer to purchase Debtor's assets. He also indicated that CVC had purchased Papercraft notes, including those held by the RTC. This was the first time that CVC informed the [C]ommittee that it intended to make an asset purchase offer. It also was CVC's first communication or confirmation to the [C]ommittee of the fact that CVC had purchased notes. [FN3]

FN3. In his pretrial declaration, Muqaddam states that "CVC made formal disclosure to entities that were members of the [C]ommittee much earlier" than September of 1991. Defendant's Pre–Trial Evidentiary Submission, Declaration of M. Saleem Muqaddam, Docket Entry 122. However, we do not credit his statement. The weight of other testimony and all of the credible evidence establishes that this did not occur.

41. Shortly before September 13, 1991, Muqaddam provided drafts of an asset purchase agreement to Debtor for its review and comment.

42. CVC made its asset purchase offer in a letter to Debtor dated September 13, 1991. BNYCC had agreed to provide financing.

43. On October 15, 1991, Debtor filed an amended version of the BDK Plan which

was further amended on subsequent occasions.

44. Debtor also filed a second plan, the CVC Plan, at CVC's suggestion, on October 15, 1991. CVC's asset purchase offer formed the cornerstone of the CVC Plan. CVC consented to the use of its asset purchase offer in the CVC Plan.

45. Debtor filed a disclosure statement for the Amended BDK Plan on October 15, 1991, and a disclosure statement for the CVC Plan on the same date.

46. The court approved the BDK disclosure statement on December 17, 1991.

47. CVC filed objections to confirmation of the Amended BDK Plan on January 14, 1992, because the [C]ommittee did not agree to CVC's claim based on the face amount of the notes. The plan was confirmed on January 21, 1992.

48. Debtor retained the exclusive right to file a plan from the date of the filing of the bankruptcy through the plan confirmation.

49. When purchasing claims, CVC did so through brokers which resulted in CVC's identity not being revealed. [FN4]

FN4. CVC switched brokers, from Citicorp Securities Markets, Inc., to UBS Securities, when Citicorp Securities had been unsuccessful in obtaining the notes held by the RTC for CVC.

*In re Papercraft Corp.*, 187 B.R. at 491–94.

On October 31, 1991, the Committee filed a complaint against CVC objecting to the allowance of claims CVC had purchased and seeking equitable subordination of the same. After the close of discovery, the Committee filed a motion for partial summary on its objection. By opinion and order dated April 22, 1994, the Bankruptcy Court granted the Committee's motion allowing CVC's claim as a general unsecured claim in the amount of $60,849,299.10, the face value of the notes it purchased, but limited CVC's recovery to $10,553,541.88, the amount CVC paid for its claim. *In re Papercraft Corp.*, 187 B.R. at 491. The Committee's request for equitable subordination was reserved for trial. *Id.*

A trial was held on November 14 and 15, 1994. Both CVC and the Committee agreed that the previous summary judgment ruling should be withdrawn and requested that the Bankruptcy Court decide all issues in the case based upon the evidence and testimony adduced at trial. *Id.* Accordingly, the Bankruptcy Court withdrew its April 22, 1994 opinion and order and ruled on all issues.

The Bankruptcy Court held that CVC's intention was to benefit from its position as a director of Papercraft by purchasing claims at a discount. *Id.* at 497. The Bankruptcy Court concluded that CVC had not carried out its "fiduciary obligation to act in the best interest of [Papercraft] and its estate [because it had] purchased claims without first providing Papercraft with the opportunity to make the purchases." [5] *Id.* at 499.

The Bankruptcy Court noted further that CVC's conduct had resulted in at least three adverse effects. First, the selling noteholders would have received a total distribution of $15,989,676.56 under the plan rather than the amount paid by CVC of $10,553,541.88 if they had decided not to sell after full disclosure by CVC. Although the noteholders may have still elected to sell after full disclosure, the harm lies in the fact that they "were deprived of the ability to make a fully informed decision concerning the sale of their claims." *Id.* at 499.

Second, "CVC's actions diluted the voting rights of prepetition creditors and resulted in CVC's attempt to wrest from the prepetition creditors the valuable assets of [Papercraft] ." *Id.* at 499. The Bankruptcy Court pointed out that without full disclosure the market for claims suffers as an efficient market requires that both buyers and sellers have access to information so that all parties to the transaction can be adequately informed. Also, "because only the name of the transferee of record need be disclosed, parties in interest will be unable to ascertain who the real claims buyer is and the intentions of that claims buyer with respect to the control of a debtor." *Id.* at 500.

Lastly, CVC actions created a conflict of interest which jeopardized its ability "to make future decisions of claims as a director free of [its] own personal interests as [an] owner of claims. Adding to the conflict is the fact these purchases were made at a discount from present value. This brings into play a profit motive, accentuating [its] personal interests." *Id.* at 500 (quoting *In re Cumberland Farms, Inc.*, 181 B.R. 678, 680 (Bankr.D.Mass.1995)).

As a result, the Bankruptcy Court created and applied a per se rule which prohibits a debtor's insiders from purchasing claims against it without disclosing their identity and relationship with the debtor. The Court held that when claims are purchased by insiders without making such disclosures to the debtor and creditors, "the insider's newly acquired claim will be limited to the amount paid by the acquiring insider and recovery on the claim will be limited to the percentage distribution provided in the plan, as applied to the allowed claim." *Id.* at 491. The Bankruptcy Court concluded that the "unfairness caused by CVC's conduct would not be adequately addressed absent application of a per se rule." *Id.* at 501.

The Bankruptcy Court held that further subordination of CVC's claims pursuant to the principles of equitable subordination was not appropriate. *Id.* at 501. The Court noted that equitable subordination of a creditor's claim is proper when (1) the creditor has engaged in inequitable conduct; (2) such misconduct caused injury to other creditors or the debtor or resulted in an unfair advantage to the creditor; and (3) subordination of the creditor's claim is consistent with the Bankruptcy Code. *Id.* at 502 (citing *Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977)). The Bankruptcy Court found that the first two elements had been satisfied but not the third. *Id.* at 502. The Court

---

**5.** The Bankruptcy Court explained that "[a]ppropriation of corporate opportunities by a fiduciary of an insolvent entity, even with the approval of the shareholders, directors, and officers, is impermissible when it results in a detriment to creditors." *Id.* at 499 (quoting *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1005 (3d Cir.1973)).

concluded that because it was limiting CVC's allowed claim to the amount it paid for such claim the principles of fairness had already been adhered to, thus, subordination of CVC's entire claim would not be consistent with the Bankruptcy Code. *Id.* at 502.

## II. *Standard of Review*

While acting as an appellate court for a bankruptcy appeal, we may not set aside the Bankruptcy Court's factual findings unless we conclude that the determination was "clearly erroneous." Bankruptcy Rule 8013; *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1223 (3d Cir.1995); *First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 567 (3d Cir.1991). Consequently, we accept the ultimate determination of the factfinder "unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Hoots v. Commonwealth of Pennsylvania*, 703 F.2d 722, 725 (3d Cir. 1983). In considering the evidence, "due regard shall be given the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankruptcy Rule 8013; *Fellheimer*, 57 F.3d at 1223.

Our review of the legal determinations made by the Bankruptcy Court is plenary. *Brown v. Pennsylvania St. Employees Credit Union (In re Brown)*, 851 F.2d 81, 84 (3d Cir.1988). Mixed questions of law and fact must be divided into their component parts and the appropriate standard applied to each. *See Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–103 (3d Cir.1981).

## III. *Analysis*

### A. *Per Se Rule*

■ The first issue we address is the Bankruptcy Court's adoption of a per se rule. Despite the laudable purpose and intent of the Bankruptcy Court in creating such a rule, for the following reasons, we conclude that it was without the authority to do so.

As previously noted, the Bankruptcy Court adopted a per se rule prohibiting insiders of a debtor from purchasing claims against it without disclosing their identity and connection with the debtor. When an insider fails to make the requisite disclosures, his or her allowed claim will be limited to the amount paid for the claim.

The Bankruptcy Court's per se rule is a new rule. As CVC correctly points out, nothing in the Bankruptcy Code proscribes insiders from purchasing claims against a debtor or requires insiders to conduct themselves in any particular way or make any particular disclosures when so doing. Thus, the rule is a formulation of "federal common law."

As the Supreme Court has repeatedly noted, there is "no general federal common law." *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981) (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)). "Although it is much too late to deny that there is a significant body of federal law that has been fashioned by the federal judiciary in the common-law tradition, it remains true that federal courts, unlike their state counterparts, are courts of limited jurisdiction that have not been vested with open-ended lawmaking powers." *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL–CIO*, 451 U.S. 77, 95, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981).

> Nevertheless, the Court has recognized the need and authority in some limited areas to formulate what has been known as "federal common law." These instances are "few and restricted," and fall into essentially two categories: those in which a federal rule of decision is "necessary to protect uniquely federal interests," and those in which Congress has given the courts power to develop substantive law.

*Texas Industries*, 451 U.S. at 640, 101 S.Ct. at 2067 (citations and quotations omitted). The instant case falls into neither of these categories, however. There are no uniquely

federal interests at issue[6] nor does the Bankruptcy Code contain a provision giving the federal courts broad power to develop federal common law.[7] *See* 28 U.S.C. Section 2075 ("Bankruptcy rules: The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under Title 11. Such rules shall not abridge, enlarge, or modify any substantive right.").

We recognize that "[i]n almost any statutory scheme, there may be a need for judicial interpretation of ambiguous or incomplete provisions. But the authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt." *Northwest Airlines*, 451 U.S. at 97, 101 S.Ct. at 1583. Indeed, the presumption that Congress deliberately omitted the enactment of a rule is strongest when it has enacted comprehensive legislation in an area such as Bankruptcy. *See Id.*[8] As previously noted, there is no requirement in the Bankruptcy Code or Rules equivalent to the Bankruptcy Court's new per se rule. Thus, the Bankruptcy Court's ruling goes beyond judicial interpretation of ambiguous or incomplete provisions of an existing statute. While we agree that there are strong public policy arguments in favor of the Bankruptcy Court's per se rule, Congress and not the court must enact such a rule.

We find it significant that a rule already exists to address inequitable conduct by insiders trading in a debtor's claims, Section 510 of the Bankruptcy Code.[9] Section 510 is a codification of the common law doctrine of equitable subordination and is grounded in the court's equitable powers.[10] As we discuss in the next section, the Bankruptcy Court may utilize its equitable powers pursuant to Section 510 and subordinate an insider's claim for harm caused by his or her egregious conduct. Thus, Section 510 requires the Bankruptcy Court to determine on a case-by-case basis whether a claim should be subordinated. The per se rule, on the other hand, removes the principles of equity

6. Cases in which a federal rule of decision is necessary to protect uniquely federal interest are "those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Industries*, 451 U.S. at 641, 101 S.Ct. at 2067.

7. The Supreme Court has held that Congress empowered the courts to develop substantive law in the area of labor law, *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972 (1957) (holding that Section 301(a) of the Labor Management and Relations Act, 29 U.S.C. Section 185(a) not only grants jurisdiction over defined areas of labor law but also vests in the courts the power to develop a common law of labor-management relations within that jurisdiction), and antitrust law, *Texas Industries*, 451 U.S. at 642–43, 101 S.Ct. at 2067–68 (holding that Congress intended to allow federal courts to develop common law with regard to substantive violations of the Sherman Act but not with regard to the formulation of remedies for enforcement). There is nothing in the Bankruptcy Code, however, which intimates that Congress intended to delegate to the federal courts any general power to create federal common law. *See* John T. Cross, *Congressional Power To Extend Federal Jurisdiction To Disputes Outside Article III: A Critical Analysis From The Perspective Of Bankruptcy*, 87 NW. U.L.Rev. 1188, 1227 (1993).

8. *See also Resolution Trust Corp. v. Liebert*, 871 F.Supp. 370, 372 (C.D.Cal.1994) (A Financial Institution Reform, Recovery, and Enforcement Act case. "Once Congress enacts comprehensive legislation in a particular area, the courts may not add extra federal rules not derived from the legislation itself."); *Port Allen Marine Services, Inc. v. Chotin*, 765 F.Supp. 887, 890 (M.D.La. 1991) (A Comprehensive Environmental Response, Compensation and Liability Act case.) "The Court's function is to interpret the law and not to amend or supplement a law enacted by the Congress. For this court '[t]o supply omissions transcends the judicial function.'" (quoting *West Virginia Univ. Hosp. v. Casey*, 499 U.S. 83, 101, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991)).

9. Insider trading in a debtor's claims is not a new phenomenon. As exhibited by the case law, litigation arising from insider trading has plagued the courts for at least the last 144 years. *See Hill v. Frazier*, 22 Pa. 320 (1853).

10. We note that the parties have cited to no common law doctrine, nor has our research revealed any, which resembles the Bankruptcy Court's per se rule.

and applies instead a universal penalty for any instance of noncompliance. We are not unmindful of the additional burden placed on the Bankruptcy Court in applying the rules of equitable subordination to cases of this kind. *See* p. 17 *et seq., infra.* Nonetheless, because we can find no support in the law for the adoption of a per se rule, we are compelled to reverse.

## B. *Equitable Subordination*

The Committee argues that equitable subordination is an alternative ground to affirm the Bankruptcy Court's decision to limit CVC's claims to the amount it paid for them.

■ The test for equitable subordination can be found in the often cited case of *Matter of Mobile Steel Co.,* 563 F.2d 692 (5th Cir. 1977). The following three conditions must be satisfied before a claim may be subject to equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *Id.* at 699–700 (citations omitted).

■ "In determining whether these three conditions are satisfied three principles must be kept in mind." *Id.* at 700. First, "inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim." *Id.* Second, "a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *Id.* at 701. Finally, a party seeking equitable sub-

ordination of a creditor's claim usually has the burden of proof. A proof of claim executed and filed in accordance with the Bankruptcy Code constitutes a prima facie valid claim. *Id.* at 702 n. 11. A party objecting to such a claim "must come forward with enough substantiations to overcome the claimant's prima facie case and thus compel him to actually prove the validity and honesty of his claim." *Id.* at 701 (quotation omitted).

■ Although there is an initial presumption of validity that attaches to all claims, claims asserted by fiduciaries demand closer scrutiny. *Id.* at 701–02 ("[W]e must examine the conduct of fiduciary-claimants 'with a large measure of watchful care.'") (citations omitted; quoting *Washburn v. Green,* 133 U.S. 30, 43, 10 S.Ct. 280, 284, 33 L.Ed. 516 (1890)). Indeed, insider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein. *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939).

The Bankruptcy Court held that the first two conditions, (1) inequitable conduct and (2) injury or unfair advantage, had been satisfied but not the third, (3) consistency with the Bankruptcy Code. *In re Papercraft,* 187 B.R. at 502. The Court concluded that because CVC's claims were already being limited to the amount it paid for such claims, the principles of fairness had already been adhered to.[11] *Id.* Thus, the Court held, subordination of CVC's entire claim would not be consistent with the Bankruptcy Code. *Id.*

As set forth in the following discussion, we find that CVC's claims should be limited to pursuant to the principles of equitable subor-

---

**11.** The Court stated that the limitation of CVC's allowed claim to the amount CVC paid for such claim adheres to the principles of fairness because,

　　[t]he limitation of recovery removes CVC's profit, discourages similar future conduct and provides a recovery on the claims of creditors

in CVC's class which is greater than they would have had absent this limitation. It also removes any economic advantage CVC gained over other insiders who honored their duties and did not purchase claims without the appropriate disclosures.

*Id.* at 502.

dination. We do not agree with the Committee, however, that equitable subordination is an alternative grounds to affirm the October 12 Order. As we explain below, a court must make certain findings regarding the amount of subordination, findings which were not made by the Bankruptcy Court in the instant case. We now review the Bankruptcy Court's findings in connection with equitable subordination.

### 1) Inequitable Conduct

The Bankruptcy Court held that CVC engaged in inequitable conduct. *In re Papercraft*, 187 B.R. at 502. The Court concluded that CVC "did not carry out [its] fiduciary obligation to act in the best interests of [Papercraft] and its estate." *Id.* at 499. Specifically, the Court found that CVC did not engage in an arm's length transaction when it purchased Papercraft's claims. *Id.* at 499. The Court also found that CVC had appropriated a corporate opportunity when it, as a fiduciary, purchased Papercraft's claims at a discount and then sought to enforce such claims at full value. *Id.* Based upon the evidence as a whole, the Court held that "CVC's intention was to benefit from its position as a director of [Papercraft] by purchasing claims at a discount." *Id.* at 497.

■ We find that there is sufficient evidence to support the Bankruptcy Court's finding that CVC engaged in inequitable conduct. CVC does not dispute that it was an insider as defined by 11 U.S.C. 101(31)(B) because of its representation on Papercraft's Board of Directors. *Id.* at 494–95. As an insider, CVC owed a fiduciary duty to Papercraft, and upon Papercraft's becoming insolvent, such duty extended to Papercraft's creditors. *See Pepper*, 308 U.S. at 307, 60 S.Ct. at 245–46; *Brown*, 484 F.2d at 1005.

■ A fiduciary who purchases claims of an insolvent debtor at a discount without providing the debtor an opportunity to make the purchases for the benefit of all the creditors has violated his or her fiduciary duty to act in the best interest of the insolvent debtor and creditors. *See, e.g., In re Cumber-land Farms, Inc.*, 181 B.R. 678 (Bankr. D.Mass.1995). Such conduct by a fiduciary clearly supports a finding of inequitable conduct. *See, e.g., Bostian v. Schapiro (In re Kansas City Journal–Post Co.)*, 144 F.2d 791 (8th Cir.1944); *In re UVAS Farming Corp.*, 91 B.R. 575 (Bankr.D.N.M.1988).

### 2) Injury or Unfair Advantage

■ The Bankruptcy Court held that the second element of equitable subordination had been satisfied. As previously noted, the Bankruptcy Court held that CVC's conduct had resulted in at least three adverse effects. The Court's findings also support a finding that CVC created an unfair advantage for itself.

As described more fully in the October 12 Order, CVC engaged in a comprehensive information collection effort made possible by its position on Papercraft's Board. *In re Papercraft*, 187 B.R. at 494–96. CVC then used this information to prepare its own asset purchase offer which directly competed with the BDK plan. That CVC utilized Papercraft's personnel and resources and the Committee's financial advisor, all without the Committee's knowledge, makes its actions even more culpable. Accordingly, we find that the Bankruptcy Court's finding of this element was supported by the evidence and not clearly erroneous.

### 3) Consistency With The Bankruptcy Code

The Bankruptcy Court concluded that because CVC's allowed claims had already been limited to the amount it paid for such claims pursuant to its per se rule, equitable subordination would not be consistent with the Bankruptcy Code. *Id.* at 502. The Court stated that "because we are limiting the allowed amount of CVC's claim to the amount it paid for the claims, with recovery under the plan gauged to that amount, we have adhered to the principles of fairness without the necessity of subordinating CVC's claim." *Id.*

The Bankruptcy Court's conclusion was with regard to whether CVC's remaining

claim, that is the amount remaining after application of the per se rule, should be subordinated. Apparently, the Court found that further subordination would not be consistent with the Bankruptcy Code because as it correctly noted, equitable subordination is appropriate only to the extent necessary to offset any harm to the debtor or other creditors. *Id.* at 501–02.

 Although the Bankruptcy Court identified several harmful effects resulting from CVC's conduct, the Court did not address the amount of harm in economic terms. The Bankruptcy Court concluded instead that "the usual remedy for the improper purchase of claims at a discount by a fiduciary is to subordinate or disallow the fiduciary's claim to the extent its face amount exceeds the amount paid." *In re Papercraft*, 187 B.R. at 501 (citing *In re Norcor Mfg. Co.,* 109 F.2d 407 (7th Cir.1940); *In re Philadelphia & W. Ry. Co.,* 64 F.Supp. 738 (E.D.Pa. 1946)). The Bankruptcy Court stated this conclusion in support of the amount of subordination of CVC's claims pursuant to the per se rule. *In re Papercraft*, 187 B.R. at 501. While we agree with the Bankruptcy Court's conclusion that a fiduciary who purchases

claims against an insolvent debtor shall ordinarily have his or her claim subordinated, we do not agree that the amount of such subordination is usually equal to the limitation imposed by its per se rule.[12]

In addition to the cases cited by the Bankruptcy Court, the Committee cites several other cases which allegedly support the proposition that the remedy in such circumstances is that the fiduciary's allowed claim will be limited to his or her purchase price with recovery under the bankruptcy plan being gauged to such reduced claim.[13] The courts in these cases do hold that a fiduciary's claim purchased when the debtor was insolvent will be limited to the amount paid. A more thorough reading of these cases reveals, however, that what is being subordinated is the fiduciary's profits. None of these cases holds that a fiduciary's allowed claim will be limited to the amount paid *with recovery under the plan being gauged to such allowed claim.* To the contrary, these cases apparently hold that a fiduciary's *recovery* on claims purchased when the debtor is insolvent will be limited to the amount paid for such claims.[14]

When stating that a fiduciary's claim would be allowed up to the amount paid, these

---

**12.** The economic impact of the Bankruptcy Court's ruling on CVC is severe. As previously noted, CVC purchased a total of $60,849,575.72 in face value of Papercraft's First and Second Priority notes for $10,553,541.88, an average of approximately $0.24 on the dollar for First Priority notes and $0.12 on the dollar for Second Priority notes. CVC's Opening Br at 11–13. At the values established by the Bankruptcy Court at the plan confirmation hearing, noteholders are to receive BDK Units equal to $0.335 on the dollar for First Priority note claims and $0.1675 on the dollar for Second Priority note claims. *In re Papercraft*, 187 B.R. at 492. Under the Bankruptcy Court's holding, which limits CVC's allowed claim to the $10,553,541.88 purchase price with recovery under the plan gauged to this amount, CVC would recover only about $3,063,-600 in BDK Units on its claims, approximately $7,489,941.88 less than what it paid. If CVC's claims were allowed at face value, however, it would recover approximately $15,987,600 in BDK Units, $5,434,058.12 more than what it paid for the claims. *See* CVC's Opening Br at 17.

**13.** The Committee's Opening Br at 35 (citing *Allied Eastern States Maintenance Corp. v. Miller*

*(In re Lemco Gypsum, Inc.),* 911 F.2d 1553, 1558 (11th Cir.1990); *In re Cumberland Farms, Inc.,* 181 B.R. at 681; *Matter of Executive Office Centers, Inc.,* 96 B.R. 642, 649–50 (Bankr.E.D.La. 1988)); Minkel & Baker, *Claims & Control In Chapter 11 Cases: A Call For Neutrality,* 13 Cardozo L.Rev. 35, 61 n. 111 (1991) (citing *Sampsell v. Bridgford (In re Bridgford Co.),* 237 F.2d 182 (9th Cir.1956); *Monroe v. Scofield (In re Gallic-Vulcan Mining Corp.),* 135 F.2d 725 (10th Cir. 1943); *Terminal & Shaker Heights Realty Co. v. Van Sweringen Co. (In re Van Sweringen Co.),* 119 F.2d 231 (6th Cir.1941); *In re Norcor,* 109 F.2d at 407 (7th Cir.1940); *In re Philadelphia & W. Ry. Co.,* 64 F.Supp. 738 (E.D.Pa.1946); *In re Jersey Materials Co.,* 50 F.Supp. 428 (D.N.J. 1943); *In re Los Angeles Lumber Prods. Co.,* 46 F.Supp. 77 (S.D.Cal.1941); *In re McCrory Stores Corp.,* 12 F.Supp. 267 (S.D.N.Y.1935)).

**14.** *See Sampsell,* 237 F.2d at 186 (Fiduciary "is precluded from collecting more than he paid for a claim against an insolvent corporation to which he owed a fiduciary duty."); *Monroe,* 135 F.2d at 728 (Fiduciary "is limited in his right of recovery to the $200 which he paid for his claim."); *In re Van Sweringen,* 119 F.2d at 235 ("Where the directors of a corporation, contrary

courts did not hold that the fiduciary's recovery would then be gauged to such allowed claim, but instead allowed the claim only to an amount which would disgorge any profits to be made. In contrast, the term "allowed claim" as used in the instant case takes on a more precise meaning as the Bankruptcy Court went one step further by adding to its holding that CVC's recovery under the plan would be gauged to the already reduced claim.

Indeed, these cases rely on the universal precept that a fiduciary may not "serve himself first and his cestuis second." *Pepper,* 308 U.S. at 311, 60 S.Ct. at 247. As Justice Cardozo noted in the often quoted passage from *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928):

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held by something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions.... Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

to their fiduciary duty, have made a personal profit in their dealings with the corporation, equity will compel them to account to the corporation for such profits made at its expense."); *In re Norcor,* 109 F.2d at 411 (Fiduciaries are not "entitled to the allowance of a claim in an amount which would have inured to his individual profit."); *In re Philadelphia & W. Ry.,* 64 F.Supp. at 740–41 ("These directors will not be compelled to account for profits from sales of bonds which had been purchased in good faith before their appointment but only for such profit as they realized from the sales of bonds purchased during their incumbency."); *In re Jersey Materials,* 50 F.Supp. at 431 (Fiduciary "should recover for the bankrupt estate no more than the sum of money paid by him for the mortgage, together with interest from the date he paid it.");

The courts have made it clear that a fiduciary is not entitled to any profits resulting from the purchase of claims against an insolvent debtor. Thus, CVC's claims should at a minimum be limited to the amount paid for such claims to eliminate any potential profits. If we affirm the October 12 Order, however, CVC's projected recovery will be reduced by an additional $7,489,941.88. As explained by the Ninth Circuit in *In re Westgate–California Corp.,* 642 F.2d 1174, 1177–78 (9th Cir. 1981):

> Subordination is an equitable power and is therefore governed by equitable principles.
>
> \* \* \* \* \* \*
>
> The time-honored maxim that equity will not enforce a penalty adds another limitation to the subordination power. Bankruptcy courts must take care not to subordinate claims where doing so will operate only to penalize the claimant. "[T]he power of subordination necessarily must be measuredly and not blankly exercised.... It should not operate to take away anything punitively to which one creditor is justly entitled in view of the liquidation finality, and bestow it upon others, who in the relative situation have no fair right to it. It can therefore ordinarily go no farther than to level off actual inequitable disparities on the bankruptcy terrain for which a creditor is responsible, to the point where they will not create unjust disadvantages in claim positions and liquidation results."

(quoting *Bostian,* 144 F.2d at 800–01); *see also, Matter of Mobile Steel Co.,* 563 F.2d at

*In re McCrory Stores,* 12 F.Supp. at 268–69 (Corporation in bankruptcy in which creditors were to receive full payment of their claims under proposed bankruptcy plan. "A director who acquires claims [when the debtor is insolvent] may enforce them for no more than the cost of acquisition. [Director] then was inhibited from making a profit...."); *Matter of Executive Office Centers,* 96 B.R. at 650 (Denying creditor's motion to subordinate claim because neither it nor any other creditor was harmed citing to *In re Van Sweringen, In re Norcor,* and *In re Philadelphia & W. Ry.,* as standing for the proposition that the basis for limiting a fiduciary's claim is "that a fiduciary shall not be allowed to profit from his trust.").

701 ("[I]f a claimant guilty of misconduct asserts two claims, each worth $10,000, and the injury he inflicted on the bankrupt or its creditors amounted to $10,000, only one of his claims should be subordinated."); *Matter of Pinetree Partners, Ltd.,* 87 B.R. 481, 488 (Bankr.N.D.Ohio 1988) (claims should be subordinated only to extent necessary to offset the harm the bankrupt and its creditors suffered).

As we previously noted, because it adopted a per se rule, the Bankruptcy Court did not have the opportunity to make factual findings as to how an additional $7,489,941.88 reduction in CVC's recovery comports with the principles of equitable subordination. We do not conclude today, however, that CVC's claims may not be subordinated by such an amount but only that any amount of subordination beyond the limitation of CVC's recovery to the amount paid for such claims should be supported by factual findings and reconciled with the principles of equity. We believe this to be a finding of fact best left to the Bankruptcy Court, not this Court sitting as a court of appeal. Accordingly, we will remand the case to the Bankruptcy Court for a finding on the amount CVC's claims should be subordinated pursuant to the principles of equitable subordination.